**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN BYRNE, individually and as representative of classes of similarly situated participants in the TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA (TIAA) CODE SECTION 401(k) PLAN and the TIAA RETIREMENT PLAN, <br><br> PLAINTIFF, <br><br> v. <br><br> TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA (TIAA), the TIAA BOARD OF TRUSTEES and its members, the TIAA PLAN INVESTMENT REVIEW COMMITTEE and its members, and JOHN DOES 1–30, <br><br> DEFENDANTS. | CASE NO. 25-CV-4228 |

**COMPLAINT**

1.      Plaintiff Brian Byrne ("Plaintiff"), by and through his undersigned attorneys, on behalf of the Teachers Insurance and Annuity Association of America ("TIAA") Code Section 401(k) Plan (the "401(k) Plan") and the TIAA Retirement Plan (the "Retirement Plan") (collectively, the "Plans"), himself, and all others similarly situated, states and alleges as follows:

## I.      INTRODUCTION

2.      This case involves multiple breaches of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"), by the fiduciaries of TIAA's Plans. ERISA requires fiduciaries of retirement plans to closely monitor plan investments, to remove imprudent investments within a reasonable time, and to make all investment decisions solely in the interest of the plan's participants and beneficiaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

1

3.    Here, Defendants TIAA, the TIAA Board of Trustees and its members (the "Board of Trustees"), the TIAA Plan Investment Review Committee and its members (the "Investment Committee"), and John Does 1–30 (collectively, "TIAA Defendants") breached these fiduciary duties.

4.    The TIAA Defendants have kept in the Plans their proprietary in-house managed funds with a higher-cost share class when a lower-cost share class was readily available, resulting in the Plans paying higher fees than they otherwise would have paid for investing in the exact same funds. A loyal and prudent fiduciary would not offer in-house funds to the Plans that cause them to pay higher fees.

5.    The TIAA Defendants have also kept in the Plans a proprietary in-house managed fund that has consistently underperformed its market benchmark. The underperformance has been neither modest nor temporary. Since 2009, this fund has underperformed its stated benchmark by over 186%. After ten years of underperformance, a loyal and prudent fiduciary would have removed the fund from the Plans. But instead, the TIAA Defendants kept the fund in the Plans, and the Plans' participants and beneficiaries have suffered as a result.

6.    Plaintiff therefore brings this case to remedy both violations of ERISA: (i) that Defendants included in its Plans higher-cost share classes of the exact same proprietary in-house funds, and (ii) that Defendants offered and continued to offer a proprietary in-house fund that has underperformed its benchmark since 2009.

## II.    OVERVIEW OF THE CLAIMS

7.    Plaintiff Brian Byrne brings this action under 29 U.S.C. §§ 1109(a) and 1132(a)(2) on behalf of the Plans and the Plans' participants and beneficiaries against the TIAA Defendants for breaches of fiduciary duties under ERISA, 29 U.S.C. §§ 1001–1461.

8.      ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (citation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

9.      As Plan fiduciaries, the TIAA Defendants also are strictly prohibited from dealing with Plan assets for their own benefit or for the benefit of parties in interest. ERISA § 406, 29 U.S.C. § 1106.

10.     But this is precisely what the TIAA Defendants did. In or before 2009, the Investment Committee selected the College Retirement Equities Fund ("CREF") as an investment option for the Plans. CREF is an open-end investment company registered under the Investment Company Act of 1940.

11.     CREF offers eight different investment strategies: the CREF Stock Fund (the "Stock Fund"), the CREF Money Market Fund (the "Money Market Fund"), the CREF Social Choice Fund (the "Social Choice Fund"), the CREF Global Equities Fund (the "Global Equities Fund"), the CREF Growth Fund (the "Growth Fund"), the CREF Equity Index Fund (the "Equity Index Fund"), the CREF Inflation-Linked Bond Fund (the "Inflation-Linked Bond"), and the CREF Core Bond Fund (the "Core Bond Fund") (collectively, the "CREF Funds").

12.     The CREF Funds are proprietary in-house funds managed by TIAA-CREF Investment Management, LLC ("TCIM"), a wholly controlled subsidiary of TIAA. As the investment adviser, fund administrator, and underwriter, the TIAA Defendants earn fees as a percentage of the assets in the CREF Funds.

13.     The CREF Funds offer institutional investors four different share classes: Class R1, Class R2, Class R3, and Class R4. For several years, the Investment Committee offered the CREF Funds in an R3 share class (the "R3 Classes"). The Plans had invested over $2.2 billion in the R3 Classes of the CREF Funds and nearly $800 million in the R4 shares it offered (the "R4 Classes") as of December 31, 2023. Although the TIAA Defendants purportedly provide their services for the CREF Funds at "cost," the TIAA Defendants nevertheless collected millions of dollars each year in fees from the Plans' assets invested in the CREF Funds.

14.     On or around September 16, 2022, each of the CREF Funds began offering institutional investors its newly created class of shares, the R4 Classes. Each of the R4 Classes has total annual fees that are significantly less than the total fees of the R3 Classes. For example, as illustrated in Section VIII, a $100,000 investment in the R4 Classes of the Equity Index Fund would incur fees of $170 compared to $1,043 in fees from the R3 Classes over a 5-year period, assuming 5% investment returns each year.

15.     Despite the higher fees, the TIAA Defendants continued to offer the R3 Classes as investment options in the Plans even though the Plans qualify to invest in the R4 Classes.

16.     As of December 31, 2023, the Plans had invested over $2.2 billion in the R3 Classes. By not transferring this $2.2 billion into the less costly R4 Classes, the TIAA Defendants have unnecessarily cost the Plans millions of dollars in retirement savings. The TIAA Defendants have thereby engaged in disloyal and imprudent conduct in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), and have engaged in prohibited self-dealing with their proprietary in-house funds in violation of ERISA § 406(a) and (b), 29 U.S.C. § 1106(a) and (b).

17.    The fiduciary breaches committed by the TIAA Defendants do not end there. In or before 2009, the Investment Committee selected the Growth Fund as an investment option for the Plans. The Investment Committee has retained the Growth Fund for at least 15 years.

18.    According to data compiled by Morningstar, Inc. ("Morningstar"),[1] over that time, the Growth Fund did not beat its designated market benchmark, the Russell 1000 Growth Index.[2] By April 30, 2019, cumulative investment performance of the Growth Fund lagged the Russell 1000 Growth Index over the preceding 3-, 5-, and 10-year periods. Moreover, the Growth Fund also underperformed other large-cap growth alternatives over the same 10-year period.

19.    The Growth Fund continued to underperform the Russell 1000 Growth Index throughout the class period, which commenced May 20, 2019 (the "Class Period"). Since its inception in 1994, the Growth Fund has underperformed the Russell 1000 Growth Index.

20.    Throughout this prolonged period of underperformance, the TIAA Defendants collected, and continue to collect, millions of dollars in fees through the Plans.

21.    The results of the Growth Fund have had an adverse financial impact on the Plans. As of December 31, 2023, participants in the Plans had invested approximately $480 million of their retirements savings—i.e., 5% of the assets of the Plans—in the R3 Class of the Growth Fund. As described in Section X, by failing to remove the underperforming Growth Fund, the TIAA

---

[1] Morningstar is the leading provider of independent investment research products (e.g., data and research insights on managed investment products, publicly listed companies, and private capital markets) relied upon by individual investors, financial advisers, asset managers, retirement plan providers and sponsors, and institutional investors in the private capital markets in North America, Europe, Australia, and Asia.

[2] The Russell 1000 Growth Index is independently maintained by Financial Times Stock Exchange ("FTSE") Russell, a wholly owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider of benchmarking, analytics, and data solutions for investors with over 30 years in the business. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

Defendants caused the Plans and their participants to lose millions of dollars in retirement savings since the start of the Class Period relative to what the Plans would have earned if the same savings had been invested in an asset tracking the Russell 1000 Growth Index, or in one of the comparator funds described in Section IX.

22.     To remedy the breaches of fiduciary duties committed by the TIAA Defendants, Plaintiff brings this action on behalf of the Plans under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2). Plaintiff seeks to enforce the TIAA Defendants' personal liability, under ERISA § 409(a), 29 U.S.C. § 1109(a), to make good to the Plans all losses and restore to the Plans all profits resulting from each breach of fiduciary duty occurring during the Class Period. In addition, Plaintiff seeks such other Plan-wide equitable or remedial relief for the Plans as the Court may deem appropriate.

23.     Plaintiff did not have knowledge of all material facts (including, among other things, comparisons of the Plans' investment performance and that of other available investment alternatives) necessary to understand that the TIAA Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before filing this Complaint. Further, Plaintiff does not have actual knowledge of the specifics of the TIAA Defendants' decision-making processes with respect to the Plans, including the TIAA Defendants' processes for monitoring and removing the Plans' investments, because this information is solely within the possession of the TIAA Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon, among other things, the facts set forth herein.

### III.    PARTIES

**A.    Plaintiff**

24.    Plaintiff Brian Byrne brings this suit in a representative capacity on behalf of the Plans and their participants and beneficiaries pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), seeking appropriate relief under ERISA § 409, 29 U.S.C § 1109, to protect the interests of both entire Plans. Plaintiff was a participant in the Plans, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), and held numerous CREF Funds, including the Growth Fund, during the Class Period. Plaintiff suffered individual injury by investing in the CREF Funds.

**B.    Defendants**

25.    TIAA is headquartered in New York, New York, and is a major U.S. financial institution with over $1 trillion in assets under management. TIAA is the sponsor, administrator, and recordkeeper for the Plans. TIAA acts through its Board of Trustees.

26.    The TIAA Board of Trustees is responsible for appointing and monitoring the Head of Total Rewards and the Investment Committee, which administer and manage the Plans. The Head of Total Rewards and the Investment Committee serve at the pleasure of the Board of Trustees.

27.    TIAA is a fiduciary of the Plans and manages the operation and administration of the Plans. TIAA has designated the Head of Total Rewards to carry out many duties as administrator of the Plans. TIAA has designated the Investment Committee to carry out many duties with respect to investment oversight.

28.    Current and former Heads of Total Rewards and members of the Investment Committee are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority and/or discretionary control over management of the Plans.

29.     Because Plaintiff is currently unaware of the identities of the individual members of the Board of Trustees, the Investment Committee, and former Heads of Total Rewards, those individuals are collectively named as Defendants John Does 1–30. Plaintiff will substitute the real names of the Doe Defendants when they become known to Plaintiff. To the extent the TIAA Defendants delegated any of their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiff, each such person or entity to which the function was delegated is also a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and is thus alleged to be a Doe Defendant.

## IV.     JURISDICTION, VENUE, AND STANDING

30.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

31.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plans are administered and where at least one of the alleged breaches took place. It is also the District in which the TIAA Defendants reside.

32.     As a participant in the Plans and holder of numerous CREF Funds, including the Growth Fund, Plaintiff has standing to bring claims on behalf of both Plans pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and is a participant seeking appropriate Plan-wide relief for both Plans under ERISA § 409, 29 U.S.C. § 1109. Thus, Plaintiff brings this suit under 29 U.S.C. § 1132(a)(2) in a representative capacity on behalf of each of the Plans as a whole and seeks remedies under 29 U.S.C. § 1109 to protect the entirety of both Plans.

33.     Plaintiff has standing to bring claims on behalf of all holders of the CREF Funds because the alleged harms to holders of the CREF Funds can be traced to the same conduct: the

disloyal and imprudent process violative of ERISA that the TIAA Defendants used to select, monitor, and retain each and every one of the CREF Funds in both Plans. This singular conduct with respect to the CREF Funds as a whole harmed each of the holders of the specific CREF Funds, as discussed in this Complaint.

## V.    ERISA'S FIDUCIARY STANDARDS

34.    ERISA's fiduciary duties are "the highest known to the law." *Tibble*, 843 F.3d at 1197 (9th Cir. 2016) (en banc) (citation omitted). ERISA imposes strict fiduciary obligations on the TIAA Defendants, including the duty of prudence, the duty of loyalty, the duty to adhere to Plan documents, and the requirement to refrain from any prohibited transactions. These obligations apply to all fiduciary acts, including the TIAA Defendants' selection, monitoring, and retention of investment options for the Plans.

### A.    Fiduciary Duties of Prudence and Loyalty Under ERISA

35.    ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Even in a defined contribution plan in which participants choose their investments, plan fiduciaries have the duty to rigorously and independently evaluate each of the plan's investment choices to determine which may be prudently included in the plan's menu of options. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022).

36.    As part of their fiduciary duties, the TIAA Defendants have "a continuing duty to monitor [the Plans'] investments and remove imprudent ones" that exists "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by

failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If any investment is imprudent, TIAA Defendants "must dispose of it within a reasonable time." *Id.* (citation omitted).

37.    Under ERISA's duty of loyalty, the Plans' fiduciaries must exercise their discretion "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of "providing benefits to participants and their beneficiaries." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). This requires fiduciaries to act "with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

**B.    Prohibited Transactions Under ERISA**

38.    The general duties of loyalty and prudence imposed by ERISA § 404, 29 U.S.C. § 1104, are supplemented by a detailed list of transactions that are expressly prohibited by ERISA § 406, 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), states, in pertinent part, that:

> Except as provided in section 1108 of this title:
> **(1)** A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— . . .
> > **(C)** furnishing of goods, services, or facilities between the plan and a party in interest.

ERISA § 406(b), 29 U.S.C. § 1106(b), further provides, in pertinent part, that:

> A fiduciary with respect to a plan shall not—
> **(1)** deal with the assets of the plan in his own interest or for his own account,
> **(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
> **(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

39.     Section 404(a)(1)(D) of ERISA also requires each plan fiduciary to act "in accordance with the documents and instruments governing the plan," except when those documents themselves violate ERISA. 29 U.S.C. § 1104(a)(1)(D). One such governing document that fiduciaries are required to adhere to is the plan's investment policy statement.

### C.     Fiduciary Liability Under ERISA

40.     Under ERISA § 409, 29 U.S.C. § 1109, fiduciaries to the Plans are personally liable to make good to the Plans any harm caused by their breaches of fiduciary duties. ERISA § 409(a), 29 U.S.C. § 1109(a), provides in relevant part (italics added):

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to *such plan* any losses to the plan resulting from each such breach, and to restore to *such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

41.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), is the enforcement mechanism of ERISA § 409, 29 U.S.C. § 1109. It enables participants and beneficiaries to bring civil actions to seek appropriate relief under ERISA § 409, 29 U.S.C. § 1109.

### D.     Co-Fiduciary Liability Under ERISA

42.     ERISA provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary:

> **(1)** if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> **(2)** if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## VI.    THE PLANS

43.    The Plans are profit-sharing plans as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986), and are subject to the provisions of ERISA. The Plans are established and maintained under a written document in accordance with ERISA § 402(a), 29 U.S.C. § 1102(a). TIAA is the sponsor of the Plans.

44.    The Plans have provided for retirement income for over 28,000 TIAA employees, former employees, and their beneficiaries. The account balances of the Plans' participants and beneficiaries at retirement primarily depend on contributions they have made to their accounts, TIAA's matching contributions, and the performance (net of fees and expenses) of the Plans' investment options. The TIAA Defendants exclusively control the selection and retention of the Plans' investment options.

45.    As of December 31, 2023, the Plans' participants and beneficiaries have invested over $4 billion in the 401(k) Plan and over $5 billion in the Retirement Plan. Approximately $620 million in the 401(k) Plan—about 15% of its assets—were invested in the R3 Classes. Approximately $1.6 billion in the Retirement Plan—about 31% of its assets—were also invested in the R3 Classes. Additionally, approximately $150 million in the 401(k) Plan—about 4% of its assets—were invested in the Growth Fund. Approximately $370 million in the Retirement Plan— about 7% of its assets—were also invested in the Growth Fund.

46.    As of December 31, 2023, the Plans identified the following R3 Classes along with the approximate combined value of the Plans' assets invested in each fund:

| Plan Option | Value |
|---|---|
| Stock Fund R3 | $859.0 million |
| Money Market Fund R3 | $132.4 million |
| Social Choice Fund R3 | $112.6 million |
| Global Equities Fund R3 | $320.2 million |
| Growth Fund R3 | $476.8 million |
| Equity Index Fund R3 | $213.4 million |
| Inflation-Linked Bond Fund R3 | $33.1 million |
| Core Bond Fund R3 | $111.3 million |

## VII.    OVERVIEW OF CREF

47.    CREF is composed of numerous separate pools of money, or separate accounts—the CREF Funds—into which a group of investors contributes money. Each separate account is an investment fund that has its own investment objective and strategy, and invests in different securities, in pursuit of its objective and strategy.[3]

48.    TIAA, or one of its affiliates, takes this pool of money and invests in different stocks or fixed-income securities on behalf of all investors in the fund. TIAA manages the investments in each fund in accordance with the investment objectives and strategies set forth in

---

[3] The CREF Funds are packaged as part of a variable annuity. Variable annuities are investment funds that give the investor the option at retirement to take either their accumulated savings in systematic withdrawals until exhausted or receive periodic payments of income for life. The lifetime payments that CREF would make to a participant depend on the investment performance of the CREF Funds that the participant had invested in both during their pre-retirement years and their post-retirement years, the participant's life expectancy, and the payment option the participant selects.

each fund's investment guidelines. TIAA, or one of its affiliates, also acts as fund underwriter and fund administrator. For providing these services, TIAA receives various fees.

49.     The funds within CREF are not static investment options. TIAA reserves the right to add, close, substitute, or replace any of the CREF Funds, including the Growth Fund, without holder consent.

**A.    The CREF Funds Offer Multiple Share Classes**

50.     The CREF Funds offer four different share classes to institutional investors. There is no difference between share classes other than the cost. Each fund's investments are held by the fund as a whole, not by a particular class of shares, so an investor's money in the fund will be invested the same way no matter which class is held.

51.     The different share classes are available to certain institutional investors based on investment minimums. Each share class comes with different administration and distribution fees and expenses.

52.     Generally, the more expensive share classes are sold to smaller institutional investors with less bargaining power, while the lower-cost shares are sold to institutional investors with more assets. TIAA offers the R1 share classes of its CREF Funds to institutions with CREF assets under management of less than $20 million. TIAA offers the R2 share classes of its CREF Funds to institutions with CREF assets under management of $20 million or more, but less than $400 million. TIAA offers its R3 Classes to institutions with CREF assets under management of $400 million or more. TIAA offers the R4 Classes to large retirement accounts that have entered into a recordkeeping services agreement with TIAA.

**B.      Investment Aim of the Growth Fund**

53.      The Growth Fund is a large-cap growth fund. The stocks of the biggest companies typically dominate the portfolios of large-cap funds. Generally, U.S. large-cap funds invest primarily in stocks in the top 70% of the capitalization of the U.S. equity market.

54.      U.S. large-cap funds are recognized by style. Typically, large-cap funds will pursue either a growth style, a value style, or a blend style. The Growth Fund pursues a growth style.

55.      Funds with a growth style invest in stocks of companies that are projected to grow faster than other stocks. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields).

56.      The Growth Fund is an actively managed fund that relies on the professional judgment of TIAA or its affiliates to make decisions about the fund's portfolio of investments. TIAA or its affiliates decide which industries they wish to allocate assets to, as well as what stocks to buy and sell and when. Typically, TIAA's primary focus should be to outperform the benchmark it selected for the fund: the Russell 1000 Growth Index.

57.      Investment research and analysis typically drive the investment decisions of actively managed funds. Factors that an investment adviser may consider include, but are not limited to, market trends, a company's financial condition, perceived risk of investing in the company, industry and sector outlook, and the underlying stock's performances in various market conditions. Based on their respective professional judgment, one investment adviser may like consumer stocks while another may like technology stocks, while a third may like stocks whose issuers focus on environmental, social, and governance (ESG) issues.

58.     Without variations between portfolio holdings, all large-cap stock funds would own identical investment portfolios and have nearly identical investment performance. Active management entices investors with the opportunity to earn superior returns through the astute selection of investments. Astute selection typically drives superior investment performance over time and distinguishes the better-performing funds from the underperforming ones. Poor investment selection generally drives long-term underperformance.

59.     Passively managed or index funds, by contrast, replicate the investment holdings of an index. Indexes such as the Russell 1000 Growth Index are a hypothetical portfolio of securities that represents a segment of the financial market. Indexes are often used as benchmarks to gauge the success of actively managed investments. Passively managed funds are designed to match (but not beat) these market index benchmarks. Other than constructing a portfolio that passively tracks that of the index or benchmark, the investment adviser makes few, if any, investment decisions for an index fund. Vanguard is a well-known leader in the index fund space.

60.      The large-cap growth funds described in this Complaint include three actively managed funds and one passively managed fund.

## C.     Investment Risks of the Growth Fund

61.     The principal categories of risks for the Growth Fund include market risk, issuer risk, risks associated with investing in growth-oriented stocks, and active management risk.

62.     Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

63.     Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund (e.g., Microsoft) may decline in response to various

factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor management performance, major litigation, investigations, or other controversies related to the issuer.

64.    Investing in growth-oriented stocks also carries risk. Such stocks (e.g., NVIDIA) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (e.g., Bristol Myers Squibb).

65.    As an actively managed fund, the Growth Fund carries the risk that TIAA's methods and analyses, including models, tools, and data, may be flawed or incorrect and may not achieve the fund's aim. This could cause the Growth Fund to underperform its benchmark. Given that active managers are paid to beat their benchmark, chronic underperformance is a red flag that suggests investors should consider other investment options.

**D.    TIAA Selects Benchmarks to Evaluate Achievement of Potential Rewards**

66.    Investments exist in a world influenced by investment performance. Typically, investors want a portfolio that consists of investments that meet or exceed their respective benchmarks. Whether an investment performs well is concrete rather than abstract.

67.    For an actively managed investment fund, the potential reward is that the fund will deliver positive investment returns that exceed those of its designated benchmark. Investment advisers select benchmarks that they believe have similar aims, risks, and potential rewards as those of their fund.

68.    TIAA selected the Russell 1000 Growth Index as the benchmark for the Growth Fund. The Russell 1000 Growth Index is independently maintained by FTSE Russell, a wholly owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider

of benchmarking, analytics, and data solutions for investors with over 30 years in the business. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

## VIII.   THE R3 CLASSES COST THE PLANS MILLIONS

69.    For a prudent fiduciary, there is no justification for offering share classes with higher fees when the same proprietary in-house investment fund is available in share classes with lower fees. Such a decision amounts to an unnecessary waste of assets. But this is precisely what the TIAA Defendants did—they offered the R3 Classes for each of the CREF Funds in the Plans when the cheaper R4 Classes were available.

70.    As detailed below, the Plans paid higher fees than they would have, and TIAA earned greater fee income from the Plans' investments than it would have, by investing in the R3 Classes. TIAA had a financial self-interest not to replace the R3 Classes with the R4 Classes in the Plans.

71.    Had the TIAA Defendants fulfilled their duties as prudent and loyal fiduciaries, they would have replaced the R3 Classes as soon as the R4 Classes were launched in September 2022.

72.    Relying on data included in CREF's 2024 prospectus, **Table 1.a** illustrates the difference in annual fees and expenses as a percentage of assets under management between the R3 Classes and the R4 Classes.

**Table 1.a**

| Fund Name | Annual Fee and Expense Deductions |
|---|---|
| CREF Stock R3 | .255% |
| CREF Stock R4 | .100% |
| +/- | *.155%* |
| CREF Money Market R3 | .190% |
| CREF Money Market R4 | .035% |
| +/- | *.155%* |
| CREF Social Choice R3 | .220% |
| CREF Social Choice R4 | .065% |
| +/- | *.155%* |
| CREF Global Equities R3 | .250% |
| CREF Global Equities R4 | .095% |
| +/- | *.155%* |
| CREF Growth R3 | .225% |
| CREF Growth R4 | .070% |
| +/- | *.155%* |
| CREF Equity Index R3 | .185% |
| CREF Equity Index R4 | .030% |
| +/- | *.155%* |
| CREF Inflation-Linked Bond R3 | .215% |
| CREF Inflation-Linked Bond R4 | .060% |
| +/- | *.155%* |
| CREF Core Bond R3 | .250% |
| CREF Core Bond R4 | .095% |
| +/- | *.155%* |

73.     Relying on data included in CREF's 2024 prospectus, **Table 1.b** demonstrates how the difference in fees affects the annual cost of investing in the R3 Classes compared to the R4 Classes. **Table 1.b** assumes a $100,000 investment in the CREF Funds for the time periods indicated and a total redemption at the end of each of these time periods. **Table 1.b** also assumes that the investment has a 5% return each year and assumes the most expensive combination of operating expenses for R3 Classes and R4 Classes. Although actual costs may be higher or lower, based on CREF's assumptions, the costs would be:

**Table 1.b**

| Fund Name | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| CREF Stock R3 | $261 | $821 | $1,435 | $3,245 |
| CREF Stock R4 | $102 | $323 | $565 | $1,283 |
| CREF Money Market R3 | $195 | $612 | $1,071 | $2,426 |
| CREF Money Market R4 | $36 | $113 | $198 | $450 |
| CREF Social Choice R3 | $225 | $709 | $1,239 | $2,804 |
| CREF Social Choice R4 | $67 | $210 | $368 | $835 |
| CREF Global Equities R3 | $256 | $805 | $1,407 | $3,182 |
| CREF Global Equities R4 | $97 | $307 | $537 | $1,219 |
| CREF Growth R3 | $230 | $725 | $1,267 | $2,867 |
| CREF Growth R4 | $72 | $226 | $396 | $899 |
| CREF Equity Index R3 | $189 | $596 | $1,043 | $2,362 |
| CREF Equity Index R4 | $31 | $97 | $170 | $386 |
| CREF Inflation-Linked Bond R3 | $220 | $693 | $1,211 | $2,741 |
| CREF Inflation-Linked Bond R4 | $61 | $194 | $339 | $771 |
| CREF Core Bond R3 | $256 | $805 | $1,407 | $3,182 |
| CREF Core Bond R4 | $97 | $307 | $537 | $1,219 |

74.     By April 30, 2025, the R3 Classes of each of the Stock Fund, the Money Market Fund, the Social Choice Fund, the Global Equities Fund, the Growth Fund, the Equity Index Fund, the Inflation-Linked Bond Fund, and the Core Bond Fund inevitably underperformed their respective R4 Classes. Any loyal and prudent fiduciary would have seen that the more expensive R3 Classes were costing the Plans millions of dollars in retirement savings and warranted removal. Yet, the TIAA Defendants kept the R3 Classes, charging their own employees as much as 6 times the cost of an identical portfolio and costing them millions of dollars in retirement savings in the process.

## IX.     THE GROWTH FUND AND ITS COMPARATORS

### A.     The Growth Fund

75.     In or before 2009, the Investment Committee selected the Growth Fund as an investment option for the Plans.

76.     The Growth Fund's aim is to seek long-term growth of capital. The Growth Fund pursues its aim by investing primarily in equity securities, normally investing at least 80% of its assets in common stocks. The fund mainly invests in large, well-known, and established companies, especially those that have new or innovative products, services, or processes that may enhance future earnings prospects.

77.     As of the date of this Complaint, the Growth Fund's largest holdings include Microsoft, NVIDIA, Amazon, Apple, and Meta.

78.     As of the date of this Complaint, approximately 89% of the Growth Fund's portfolio is invested in large-cap stocks and 44% is invested in growth-oriented stocks.

79.     TIAA has designated the Russell 1000 Growth Index as the Growth Fund's benchmark. Morningstar classifies the Growth Fund as a large-cap growth fund.

21

80.    The Growth Fund's potential rewards are that it will generate positive investment returns that outperform its benchmark index. The Growth Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks associated with investing in growth-oriented stocks. Also, the Growth Fund, as an actively managed fund, is exposed to active management risk. Morningstar identifies the Growth Fund as having a portfolio risk score of 85 out of 100, where 100 is the score with the highest risk.

81.    As set forth below, numerous funds that are substantially similar to and better-performing than the Growth Fund have existed throughout the Class Period.

### i.    Comparator 1: Fidelity Blue Chip Growth Fund

82.    The Fidelity Blue Chip Growth Fund (the "Fidelity Fund") has similar aims, risks, and potential rewards to those of the Growth Fund.

83.    Like the Growth Fund, the Fidelity Fund is also available as a variable annuity investment strategy.

84.    The Fidelity Fund's aim is to seek long-term growth of capital. Under normal circumstances, the Fidelity Fund pursues its aim by investing primarily in common stocks of companies that have above-average growth potential. The fund normally invests at least 80% of its assets in blue chip companies—companies that are well-known, well-established, and well-capitalized—which generally have large or medium market capitalizations.

85.    Like the Growth Fund, the Fidelity Fund identifies the Russell 1000 Growth Index as one of its benchmarks. Morningstar classifies the Fidelity Fund as a large-cap growth fund.

86.    As of the date of this Complaint, the Fidelity Fund's largest holdings resemble those of the Growth Fund and include Microsoft, NVIDIA, Amazon, Apple, Alphabet, and Meta.

87.     As of the date of this Complaint, approximately 83% of the Fidelity Fund's portfolio is invested in large-cap stocks, and 43% is invested in growth-oriented stocks. .

88.     The Fidelity Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The Fidelity Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks associated with investing in growth-oriented stocks. Also, the Fidelity Fund, as an actively managed fund, is exposed to active management risk. Morningstar identifies the Fidelity Fund as having a portfolio risk score of 91 out of 100, where 100 is the score with the highest risk.

89.     The aims, risks, and potential rewards of the Fidelity Fund are similar to those of the Growth Fund given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the Fidelity Fund a meaningful comparator to the Growth Fund.

   **ii.     Comparator 2: JPMorgan Large Cap Growth Fund**

90.     The JPMorgan Large Cap Growth Fund (the "JPMorgan Fund") has similar aims, risks, and potential rewards to those of the Growth Fund.

91.     Like the Growth Fund, the JPMorgan Fund is also available as a variable annuity investment strategy.

92.     The JPMorgan Fund's aim is to seek long-term capital appreciation. Under normal circumstances, the JPMorgan Fund pursues its aim by investing at least 80% of its assets in the equity securities of large, well-established companies whose market capitalizations are similar to those within the universe of the Russell 1000 Growth Index.

93.     Like the Growth Fund, the JPMorgan Fund identifies the Russell 1000 Growth Index as one of its benchmarks. Morningstar classifies the JPMorgan Fund as a large-cap growth fund.

94.     As of the date of this Complaint, the JPMorgan Fund's largest holdings resemble those of the Growth Fund and include Microsoft, NVIDIA, Amazon, Meta, and Apple.

95.     Currently, approximately 95% of the JPMorgan Fund's portfolio is invested in large-cap stocks, and 40% is invested in growth-oriented stocks.

96.     The JPMorgan Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The JPMorgan Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks associated with investing in growth-oriented stocks. Also, the JPMorgan Fund, as an actively managed fund, is exposed to active management risk. Morningstar identifies the JPMorgan Fund as having a portfolio risk score of 74 out of 100, where 100 is the score with the highest risk.

97.     The aims, risks, and potential rewards of the JPMorgan Fund are similar to those of the Growth Fund given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the JPMorgan Fund a meaningful comparator to the Growth Fund.

**iii.     Comparator 3: Putnam Large Cap Growth Fund**

98.     The Putnam Large Cap Growth Fund (the "Putnam Fund") has similar aims, risks, and potential rewards to those of the Growth Fund.

99.     Like the Growth Fund, the Putnam Fund is also available as a variable annuity investment strategy.

100.    The Putnam Fund's aim is to generate long-term capital growth. The Putnam Fund pursues its aim, under normal circumstances, by investing at least 80% of its net assets in companies of a size similar to those in the Russell 1000 Growth Index.

101.    Like the Growth Fund, the Putnam Fund identifies the Russell 1000 Growth Index as one of its benchmarks. Morningstar classifies the Putnam Fund as a large-cap growth fund.

102.    As of the date of this Complaint, the Putnam Fund's largest holdings resemble those of the Growth Fund and include Apple, Microsoft, NVIDIA, Amazon, Alphabet, and Meta.

103.    As of the date of this Complaint, approximately 93% of the Putnam Fund's portfolio is invested in large-cap stocks, and 48% is invested in growth-oriented stock.

104.    The Putnam Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The Putnam Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks associated with investing in growth-oriented stocks. Also, the Putnam Fund, as an actively managed fund, is exposed to active management risk. Morningstar identifies the Putnam Fund as having a portfolio risk score of 86 out of 100, where 100 is the score with the highest risk.

105.    The aims, risks, and potential rewards of the Putnam Fund are similar to those of the Growth Fund given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the Putnam Fund a meaningful comparator to the Growth Fund.

    iv.    **Comparator 4: Vanguard Russell 1000 Growth Index Fund**

106.    The Vanguard Russell 1000 Growth Index Fund (the "Vanguard Fund") has similar aims, risks, and potential rewards to those of the Growth Fund.

107.    Like the Growth Fund, the Vanguard Fund is also available as a variable annuity investment strategy.

108.    The Vanguard Fund is an index fund that seeks to track the performance of the Russell 1000 Growth Index. The Vanguard Fund attempts to replicate the Russell 1000 Growth Index by investing all, or substantially all, of its assets in the stocks that make up the index, holding each stock in approximately the same proportion as its weighting in the index.

109.    As of the date of this Complaint, the Vanguard Fund's largest holdings resemble those of the Growth Fund and include Apple, Microsoft, NVIDIA, Amazon, and Meta.

110.    As of the date of this Complaint, approximately 89% of the Vanguard Fund's portfolio is invested in large-cap stocks, and approximately 38% is invested in growth-oriented stocks.

111.    The Vanguard Fund's potential rewards are that it will generate investment returns in line with the Russell 1000 Growth Index. The Vanguard Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks associated with investing in growth-oriented stocks. Morningstar identifies the Vanguard Fund as having a portfolio risk score of 84 out of 100, where 100 is the score with the highest risk.

112.    By virtue of the similarities in their respective market capitalizations, the Vanguard Fund and the Growth Fund share similar aims, rewards, and levels of risk as it is designed to mirror the composition and performance of the Russell 1000 Growth Index. This makes the Vanguard Fund a meaningful comparator to the Growth Fund.

**v.    Comparator 5: Russell 1000 Growth Index**

113.    TIAA has disclosed that the Growth Fund is benchmarked to the Russell 1000 Growth Index. The Russell 1000 Growth Index measures the performance of the large-cap growth

segment of the U.S. stock market. It includes those Russell 1000 companies that are similar to the companies included in the Growth Fund—those with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

114.    By virtue of the similarities in their respective market capitalizations, the Russell 1000 Growth Index and the Growth Fund share similar aims, rewards, and levels of risk, including market risk and issuer risk. This makes the Russell 1000 Growth Index a meaningful benchmark for the Growth Fund. Indeed, by disclosing the Russell 1000 Growth Index to the public as the appropriate benchmark for the Growth Fund, TIAA necessarily concludes that the Russell 1000 Growth Index shares similar aims, risks, and rewards as the Growth Fund.

## X.    THE GROWTH FUND UNDERPERFORMED ITS BENCHMARK AND COMPARATOR FUNDS SINCE 2009

115.    Poor investment performance and excessive fees can significantly impair the value of a participant's account. Investments grow by compounding over time, and by the same token, underperformance compounds over time. According to the U.S. Department of Labor, for example, a one percent difference in average annual returns can reduce an employee's account balance at retirement by as much as 23 to 28 percent.

116.    For a prudent fiduciary, investment options that, on average, underperform their benchmarks over rolling 3- or 5-year periods are generally candidates for removal. Upon information and belief, such guidelines are often outlined in a plan's investment policy statement.

117.    Had the TIAA Defendants fulfilled their duty with the care and skill of a prudent fiduciary, with a singular focus on the interests of the Plans' participants and beneficiaries, they would have removed the Growth Fund by the start of the Class Period. Indeed, by April 30, 2019, the Growth Fund had underperformed each of the Fidelity Fund, the JPMorgan Fund, the Putnam

Fund, and the Vanguard Fund (collectively, the "Comparator Funds"), as well as the Russell 1000 Growth Index, over the preceding 3-, 5-, and 10-year periods.

118.    **Table 2.a** demonstrates the underperformance of the Growth Fund compared to its benchmark index and to the Comparator Funds for the over 10-year period from January 1, 2009 through April 30, 2019. By the start of 2019, a prudent fiduciary would have recognized that the significant differences in cumulative investment returns between the Growth Fund and the Russell 1000 Growth Index as well as the Comparator Funds were costing the Plans tens of millions of dollars in retirement savings, making the Growth Fund a terrible incumbrance to the Plans. As detailed in **Table 2.a** below, based on average assets during this period of $200 million, the Growth Fund's underperformance cost the Plans between approximately $36 million and $184 million in retirement savings.

119.    A fiduciary properly monitoring the Plan would have seen that the circumstances warranted the selection of a new option. Yet, the TIAA defendants failed to replace the Growth Fund with any one of the many prudent alternatives available on the market.

**Table 2.a**
**January 1, 2009—April 30, 2019**

| Fund | Cumulative Return | Annualized Return | Growth of $200 Million |
|---|---|---|---|
| TIAA CREF Growth R3 | 385.41% | 16.52% | $970,821,877.29 |
| Russell 1000 Growth TR | 403.36% | 16.93% | $1,006,724,915.20 |
| *+/- TIAA CREF* | *-17.95%* | *-0.41%* | *-$35,903,037.91* |
| Fidelity Blue Chip Growth | 477.45% | 18.49% | $1,154,893,411.58 |
| *+/- TIAA CREF* | *-92.04%* | *-1.97%* | *-$184,071,534.29* |
| JPMorgan Large Cap Growth R6 | 419.70% | 17.29% | $1,039,398,462.12 |
| *+/- TIAA CREF* | *-34.29%* | *-0.77%* | *-$68,576,584.83* |
| Putnam Large Cap Growth R6 | 429.41% | 17.50% | $1,058,827,034.78 |
| *+/- TIAA CREF* | *-44.00%* | *-0.98%* | *-$88,005,157.49* |
| Vanguard Russell 1000 Growth Index I[4] | *NA* | *NA* | *NA* |
| *+/- TIAA CREF* | *NA* | *NA* | *NA* |

120.    Yet the TIAA Defendants failed to remove the Growth Fund, and the fund continued to perform poorly throughout the Class Period.

121.    **Table 2.b** illustrates the underperformance of the Growth Fund from May 1, 2019, through April 30, 2025, on an annual and cumulative basis relative to the Russell 1000 Growth Index and the Comparator Funds. The Growth Fund underperformed the Russell 1000 Growth Index by over 29% during this period.

---

[4] The Vanguard Fund was not incepted until after January 1, 2010.

**Table 2.b**
**May 1, 2019—April 30, 2025**

| Fund | Annual Performance | | | | | | | Cumulative Performance |
|---|---|---|---|---|---|---|---|---|
| | **2019**[5] | **2020** | **2021** | **2022** | **2023** | **2024** | **YTD** | |
| TIAA CREF Growth R3 | 7.94% | 40.76% | 20.43% | -32.34% | 46.09% | 32.01% | -9.53% | 116.00% |
| Russell 1000 Growth TR | 12.40% | 38.49% | 27.60% | -29.14% | 42.68% | 33.36% | -8.37% | 145.38% |
| *+/- TIAA CREF* | *-4.46%* | *2.27%* | *-7.17%* | *-3.20%* | *3.41%* | *-1.35%* | *-1.16%* | *-29.38%* |
| Fidelity Blue Chip Growth | 9.23% | 62.23% | 22.71% | -38.46% | 55.60% | 39.70% | -12.53% | 154.42% |
| *+/- TIAA CREF* | *-1.29%* | *-21.47%* | *-2.28%* | *6.12%* | *-9.51%* | *-7.69%* | *3.00%* | *-38.42%* |
| JPMorgan Large Cap Growth R6 | 12.22% | 56.42% | 18.79% | -25.21% | 34.95% | 34.17% | -6.48% | 164.04% |
| *+/- TIAA CREF* | *-4.28%* | *-15.66%* | *1.64%* | *-7.13%* | *11.14%* | *-2.16%* | *-3.05%* | *-48.04%* |

---

[5] Investment performance is from May 1 through December 31, 2019.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Putnam Large Cap Growth R6 | 11.50% | 38.89% | 22.95% | -30.10% | 44.71% | 33.70% | -8.87% | 134.68% |
| *+/- TIAA CREF* | *-3.56%* | *1.87%* | *-2.52%* | *-2.24%* | *1.38%* | *-1.69%* | *-0.66%* | *-18.68%* |
| Vanguard Russell 1000 Growth Index I | 12.35% | 38.38% | 27.52% | -29.17% | 42.65% | 33.25% | -8.39% | 144.50% |
| *+/- TIAA CREF* | *-4.41%* | *2.38%* | *-7.09%* | *-3.17%* | *3.44%* | *-1.24%* | *-1.14%* | *-28.50%* |

122.    The annualized performance numbers in **Table 2.b** highlight the overall underperformance of the Growth Fund. Though the Growth Fund occasionally outperformed its benchmark and certain Comparator Funds on an annualized basis, that outperformance was overshadowed by the multiple years in which the Growth Fund grossly underperformed its benchmark and Comparator Funds. The magnitude of this underperformance is captured by the cumulative numbers in **Table 2.b**. Overall, the Growth Fund remained an imprudent investment for the Plans.

123.    Together, **Tables 2.a** and **2.b** capture the depth and the breadth of the Growth Fund's underperformance relative to meaningful benchmarks that has persisted for more than 16 years.

124.    All the data presented in each of the above **Tables 2.a** and **2.b** were available in real time to the TIAA Defendants throughout the Class Period.

125.    The TIAA Defendants' failure to remove the Growth Fund cost the Plans millions of dollars in retirement savings. On average, during the period from May 1, 2019, through April 30, 2025, the assets of the Growth Fund were approximately $401 million. **Table 2.c** compares the investment growth of $401 million invested in the Growth Fund to the growth of $401 million invested in each of the Comparator Funds from May 1, 2019, through April 30, 2025. As **Table 2.c** shows, participants and beneficiaries of the Plans would have substantially more dollars in retirement savings had the TIAA Defendants replaced the Growth Fund with any of the Comparator Funds or a fund that more closely matched the Russell 1000 Growth Index.

**Table 2.c**
**May 1, 2019—April 30, 2025**

| Fund Name | Compounded Performance | Annualized Performance | Growth of $401 Million |
|---|---|---|---|
| TIAA CREF Growth R3 | 116.00% | 13.70% | $866.6 million |
| Russell 1000 Growth TR | 145.38% | 16.14% | $984.4 million |
| *+/- TIAA CREF* | *-29.38%* | *-2.44%* | *-$117.8 million* |
| Fidelity Blue Chip Growth | 154.42% | 16.84% | $1.021 billion |
| *+/- TIAA CREF* | *-38.42%* | *-3.14%* | *-$154.4 million* |
| JPMorgan Large Cap Growth R6 | 164.04% | 17.56% | $1.059 billion |
| *+/- TIAA CREF* | *-48.04%* | *-3.86%* | *-$192.4 million* |
| Putnam Large Cap Growth R6 | 134.68% | 15.28% | $941.5 million |
| *+/- TIAA CREF* | *-18.68%* | *-1.58%* | *-$74.9 million* |
| Vanguard Russell 1000 Growth Index I | 144.50% | 16.07% | $980.9 million |
| *+/- TIAA CREF* | *-28.50%* | *-2.37%* | *-$114.3 million* |

126.    The Comparator Funds listed in each of the above Tables are managed by reputable investment advisers with significant assets under management and are available to all large retirement plans, including TIAA's Plans. TIAA would not have had to scour the market to find them.

127.    The TIAA Defendants owed fiduciary duties to the participants and beneficiaries of the Plans to remove the Growth Fund within a reasonable time after it manifested chronic and substantial underperformance. Yet they retained the fund year after year, even though it consistently failed its objectives. A loyal and prudent fiduciary would have appreciated the overall

depth and breadth of the Growth Fund's underperformance and removed it from the Plans by the start of the Class Period. A loyal and prudent fiduciary would not have retained the Fund, as the TIAA Defendants have, throughout the Class Period.

## XI.    CLASS ACTION ALLEGATIONS

128.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under ERISA § 409(a), 29 U.S.C. § 1109(a).

129.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to a direct individual action on behalf of the Plans under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify this action as a class action on behalf of the Plans' participants and beneficiaries. Specifically, Plaintiff seeks to certify, and to be appointed as representative of, the following two classes (the "Classes"):

a.    All participants and beneficiaries of the Plans who invested in R3 Classes from September 16, 2022 through the date of judgment, excluding the TIAA Defendants, any of their directors, and any officers or employees of the TIAA Defendants with responsibility for the Plans' investment or administrative function; and

b.    All participants and beneficiaries of the Plans who invested in the Growth Fund from May 20, 2019 through the date of judgment, excluding the TIAA Defendants, any of their directors, and any officers or employees of the TIAA Defendants with responsibility for the Plans' investment or administrative function.

130.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

a.  The Classes include thousands of members and are so large that joinder of all their members is impracticable.

b.  There are numerous questions of law and fact common to the Classes because the TIAA Defendants owed the same fiduciary duties to the Plans and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plans, and not as to any individual participant, that affected all members of the  Classes through their participation in the Plans in the same way. Thus, questions of law and fact common to the Classes include, without limitation, the following: (i) whether each of the TIAA Defendants are fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) whether the fiduciaries of the Plans breached their fiduciary duties to the Plans by employing an imprudent and/or disloyal process for monitoring and evaluating Plan investment options and/or by making imprudent and/or disloyal decisions for the Plans; (iii) whether Plaintiff's claims of an imprudent and/or disloyal process and decision making require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Classes; (iv) what are the losses to the Plans resulting from each breach of fiduciary duty; and (v) what Plan-wide equitable and other relief the Court should impose in light of the TIAA Defendants' breaches of duties.

c.  Plaintiff's claims are typical of the claims of the Classes because Plaintiff was a participant during the Class Period and all participants in the Plans were harmed by the TIAA Defendants' misconduct.

d.  Plaintiff is an adequate representative of the Classes because he participated in the Plans during the Class Period, has no interest that conflicts with the Classes, is committed to the vigorous representation of the Classes, and has engaged experienced and competent attorneys to represent the Classes.

e.  There are no substantial individualized questions of law or fact among members of the Classes on the merits of this Action.

131.  Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the TIAA Defendants in respect to the discharge of their fiduciary duties to the Plans and personal liability to the Plans under ERISA § 409(a), 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

132.  Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the TIAA Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final relief or corresponding declaratory relief is appropriate respecting the Classes as a whole. Plaintiff seeks reformation of the Plans' investment options to include only prudent investments, which will benefit him and other participants and beneficiaries of the Plans.

133.  Additionally, or in the alternative, this action may be certified as a class action under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this

controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no member of the Classes has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

134.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the TIAA Defendants' liability to the Classes for their allegedly imprudent conduct.

135.    Plaintiff's counsel will fairly and adequately represent the interests of the Classes and is best able to represent the interests of the Classes under Rule 23(g).

## CAUSES OF ACTION

### COUNT I

**Breach of Duties of Loyalty and Prudence**
**Unreasonable Fees**
**(Violation of ERISA § 404, 29 U.S.C. § 1104)**
**(Against All TIAA Defendants)**

136.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

137.    The TIAA Defendants are directly responsible for ensuring the Plans' fees are reasonable for the services provided.

138.    The TIAA Defendants entered into contracts with the CREF Funds under which the TIAA Defendants and their affiliates provided investment advisory, administration, and distribution services in exchange for compensation.

139.    The CREF Funds paid fees directly or indirectly to the TIAA Defendants. The fees were generated by regularly deducting money from participants' accounts as "expenses." The TIAA Defendants set the amount of their compensation for services for the funds in the Plans in the same manner as they set the fees for all of their shareholders; though unlike as to other shareholders, the TIAA Defendants charge the Plans' participants who own the R3 Classes higher fees than they did other shareholders outside the Plans who own the R4 Classes.

140.    By charging the Plans' participants fees that are higher than those charged to other shareholders outside the Plans, the TIAA Defendants failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries of the Plans, and (A) for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans, and (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

141.    As a direct and proximate result of these breaches, the Plans suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by the Plaintiff or any member of the Classes, pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a), the TIAA Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge to the Plans all fees made as a result of the TIAA Defendants' breaches of the duty of loyalty.

142.    Each TIAA Defendant also participated in the breach of the other TIAA Defendants, knowing that such acts were a breach, and/or enabled the other TIAA Defendants to

commit a breach by failing to lawfully discharge their own fiduciary duties, and/or knew of the breach by the other TIAA Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each TIAA Defendant is liable for the Plan-wide losses caused by the breach of its co-fiduciary duties under ERISA § 405(a), 29 U.S.C. § 1105(a).

## COUNT II

**Breach of Duty of Loyalty by Failing to Remove the Growth Fund
After Years of Poor Investment Performance
(Violation of ERISA § 404, 29 U.S.C. § 1104)
(Against All TIAA Defendants)**

143.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

144.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) requires a plan fiduciary to act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

145.    Because millions of dollars of the Plans' assets were invested in TIAA's proprietary in-house Growth Fund, the TIAA Defendants had a conflict of interest when deciding whether to include or remove the Growth Fund as an investment option for the Plans. Acting in their self-interest, rather than the best interests of the Plans and their participants and beneficiaries, the TIAA Defendants retained a poorly performing investment option that benefited TIAA, rather than the Plans, despite the availability of superior—and readily available—investment alternatives as detailed in this Complaint. A loyal fiduciary, in possession of the same investment performance information, would have removed the Growth Fund as an investment option in the Plans and replaced them with a more prudent alternative.

146.    Through these actions and omissions, the TIAA Defendants failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries of the

Plans, and (A) for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

147.    As a direct and proximate result of these breaches, the Plans suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by the Plaintiff or any member of the Classes, pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a), the TIAA Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge to the Plans all profits made as a result of the TIAA Defendants' breaches of the duty of loyalty.

148.    Each TIAA Defendant also participated in the breach of the other TIAA Defendants, knowing that such acts were a breach, and/or enabled the other TIAA Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and/or knew of the breach by the other TIAA Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each TIAA Defendant is liable for the Plan-wide losses caused by the breach of its co-fiduciary duties under ERISA § 405(a), 29 U.S.C. § 1105(a).

## <u>COUNT III</u>

**Breach of Duty of Prudence by Mismanaging and Failing to Remove the Growth Fund from the Plans Within a Reasonable Time**
**(Violation of ERISA § 404, 29 U.S.C. § 1104)**
**(Against All TIAA Defendants)**

149.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

150.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

151.    Plan fiduciaries must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022).

152.    Thus, the scope of the fiduciary duties and responsibilities of the TIAA Defendants includes administering the Plans with the care, skill, diligence, and prudence required by ERISA. The TIAA Defendants are responsible for evaluating and monitoring the Plans' investments on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plans' assets are invested prudently.

153.    The TIAA Defendants breached their fiduciary duties through an imprudent process that resulted in Plans including the Growth Fund that suffered poor performance for over 16 years. TIAA Defendants failed to remove the Growth Fund within a reasonable time despite historical underperformance relative to its relevant benchmark index and Comparator Funds.

154.    By failing to replace the Growth Fund with a better-performing investment option, the TIAA Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

155.    The TIAA Defendants' breaches of fiduciary duties have substantially impaired the Plans' use, their value, and their investment performance for the Plans and their participants and beneficiaries.

156.    As a direct and proximate result of the TIAA Defendants' breaches of fiduciary duties, the Plans have suffered millions of dollars of damages which continue to accrue and for

which the TIAA Defendants are jointly and severally liable pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a).

157.    Each of the TIAA Defendants is liable to make good to the Plans as a whole the losses resulting from the aforementioned breaches and to restore to the Plans any profits resulting from the breaches of fiduciary duties alleged in this Count. The TIAA Defendants are subject to other Plan-wide equitable or remedial relief as appropriate.

158.    Each TIAA Defendant also participated in the breach of the other TIAA Defendants, knowing that such acts were a breach, and/or enabled the other TIAA Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and/or knew of the breach by the other TIAA Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each TIAA Defendant is liable for the Plan-wide losses caused by the breach of its co-fiduciary duties under ERISA § 405(a), 29 U.S.C. § 1105(a).

## COUNT IV

### Prohibited Transactions
### (Violation of ERISA § 406(a) and (b), 29 U.S.C. § 1106(a) and (b))
### (Against All TIAA Defendants)

159.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

160.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), requires a plan fiduciary to refrain from engaging in a transaction, if he knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

161.    ERISA § 406(a), 29 U.S.C. § 1106(b), provides, in pertinent part, that a fiduciary with respect to a plan shall not:

(1)     deal with the assets of the plan in his own interest or for his own account, or

(2)     in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

162.    By exercising authority and/or control with respect to the management of the Plan and their assets; and/or by rendering investment advice or by having authority or responsibility to render investment advice to the Plans; and/or by being designated in the governing document of the Plans as a fiduciary within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), the TIAA Defendants are a fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), and ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

163.    As the sponsor, administrator, recordkeeper, and provider of investment management and other services to the Plans, the TIAA Defendants are a party in interest to the Plans within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14), from which they receive compensation.

164.    By maintaining the CREF Funds in the Plans, TIAA Defendants directly or indirectly furnished services to the Plans and received compensation.

165.    By maintaining the CREF Funds in the Plans, the TIAA Defendants dealt with the assets of the Plans in their own interest and received consideration for their own personal account in connection with a transaction involving the assets of the Plans.

166.    The prohibited transactions that the TIAA Defendants engaged in are as follows:

a.    causing the Plans to engage in transactions that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest, in violation of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1);

b.    causing the Plans to engage in the above conduct and omissions, in which a fiduciary to the Plans dealt with the assets of the Plans in their own interest or for their own account, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

c.    causing the Plans to engage in the above conduct and omissions, in which a fiduciary to the Plans, in their individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plans or the interests of the Plans' participants or beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2);

d.    causing the Plans to engage in the above conduct and omissions, in which a fiduciary to the Plans received consideration for their own personal account from any party dealing with the Plans in connection with a transaction involving the assets of the Plans, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

167.    As both a fiduciary and a party in interest, the TIAA Defendants are liable for these violations of ERISA § 406(b)(1), (2), and (3), 29 U.S.C. § 1106(b)(1), (2), and (3), pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

168.     As a direct and proximate result of the TIAA Defendants' breaches of fiduciary duties, the Plans have suffered millions of dollars of damages which continue to accrue and for which the TIAA Defendants are jointly and severally liable pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a).

169.     Each of the TIAA Defendants is liable to make good to the Plans as a whole the losses resulting from the aforementioned breaches and to restore to the Plans any profits resulting from the breaches of fiduciary duties alleged in this Count. The TIAA Defendants are subject to other Plan-wide equitable or remedial relief as appropriate.

170.     Each TIAA Defendant also participated in the breach of the other TIAA Defendants, knowing that such acts were a breach, and/or enabled the other TIAA Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and/or knew of the breach by the other TIAA Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each TIAA Defendant is liable for the Plan-wide losses caused by the breach of its co-fiduciary duties under ERISA § 405(a), 29 U.S.C. § 1105(a).

## COUNT V

### Failure to Monitor
### (Against All TIAA Defendants)

171.     All allegations set forth in the Complaint are realleged and incorporated herein by reference.

172.     The TIAA Defendants had a duty to monitor the performance of each party to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of the Plans' assets, and must take prompt and effective action to protect the Plans and the participants and beneficiaries of the Plans when they are not.

173.    To the extent any TIAA Defendants' fiduciary responsibilities were delegated to another fiduciary, the TIAA Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently, loyally, and in compliance with governing documents of the Plans.

174.    The TIAA Defendants breached their fiduciary monitoring duties by, among other things:

a.    failing adequately to monitor their appointees, to evaluate their performance, or to have an adequate system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA with respect to the Plans;

b.    failing to monitor their appointees' fiduciary process, which was imprudent, ridden with conflicts, and ignored governing documents of the Plans;

c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent and selected in compliance with the Plans' investment policy statements;

d.    failing to ensure that the monitored fiduciaries had a conflict-free process in place for evaluating and ensuring that investment options were selected solely in the interests of the Plans' participants and beneficiaries and did not constitute prohibited transactions; and

e.    failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plans, to the detriment of the retirement savings of the Plans' participants and beneficiaries.

175.    Each fiduciary who delegated their fiduciary responsibilities likewise breached their fiduciary monitoring duty by, among other things:

    a.    failing adequately to monitor their appointees, to evaluate their performance, or to have an adequate system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA with respect to the Plans;

    b.    failing to monitor their appointees' fiduciary process, which was imprudent, ridden with conflicts, and ignored governing documents of the Plans;

    c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent and selected in compliance with the Plans' investment policy statements;

    d.    failing to ensure that the monitored fiduciaries had a conflict-free process in place for evaluating and ensuring that investment options were selected solely in the interests of the Plans' participants and beneficiaries and did not constitute prohibited transactions; and

    e.    failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plans, to the detriment of the retirement savings of the Plans' participants and beneficiaries.

176.    As a direct result of these breaches of the fiduciary duty to monitor, the Plans suffered substantial losses. Had TIAA and the other delegating fiduciaries discharged their fiduciary monitoring duties, the Plans would not have suffered these losses.

**PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plans as a whole and all similarly situated participants and beneficiaries of the Plans, respectfully requests that the Court:

    i.    find and adjudge that the TIAA Defendants have breached their fiduciary duties, as described above;

    ii.    find and adjudge that the TIAA Defendants are personally liable to make good to the Plans the losses to the Plans as a whole resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duties;

    iii.    order the TIAA Defendants to make good to the Plans as a whole the losses resulting from each breach of fiduciary duty and to restore to the Plans any profits resulting from each breach of fiduciary duty;

    iv.    find and adjudge that the TIAA Defendants are liable to the Plans for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

    v.    determine the method by which losses to the Plans under ERISA § 409(a), 29 U.S.C. § 1109(a), should be calculated;

    vi.    order the TIAA Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under ERISA § 409(a), 29 U.S.C. § 1109(a);

    vii.    impose surcharge against the TIAA Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

viii.    order the proceeds of any Plan-wide recovery for the Plans to be allocated to the accounts of members of the Classes to make them whole for any injury that they have suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

ix.    certify the Classes, appoint the Plaintiff as class representative, appoint Sanford Heisler Sharp McKnight, LLP as class counsel, and appoint Charles Field and Russell Kornblith as lead counsel for the Classes;

x.    award to the Plaintiff and the Classes their attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and the common fund doctrine;

xi.    order the TIAA Defendants to pay interest to the extent allowed by law; and

xii.    grant such other equitable or remedial relief as the Court deems appropriate.

DATED: May 20, 2025                Respectfully submitted,


                                   */s/ Russell Kornblith*
                                   RUSSELL KORNBLITH (RK1950)
                                   SHARON KIM (SK2752)
                                   **SANFORD HEISLER SHARP MCKNIGHT, LLP**
                                   17 State Street, Suite 3700
                                   New York, NY 10004
                                   Telephone: (646) 402-5650
                                   Facsimile: (646) 402-5651
                                   rkornblith@sanfordheisler.com
                                   sharonkim@sanfordheisler.com

                                   CHARLES FIELD (CA Bar No. 189817)*
                                   **SANFORD HEISLER SHARP MCKNIGHT, LLP**
                                   7911 Herschel Avenue, Suite 300
                                   La Jolla, CA 92037
                                   Telephone: (619) 369-4523
                                   Facsimile: (619) 577-4250
                                   cfield@sanfordheisler.com


                                   *Counsel for Plaintiff*
                                   *\* pro hac vice forthcoming*