## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN BYRNE, individually and as representative of classes of similarly situated participants in the TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA (TIAA) CODE SECTION 401(k) PLAN and the TIAA RETIREMENT PLAN,<br><br>          Plaintiff,<br><br>   v.<br><br>TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA (TIAA), the TIAA BOARD OF TRUSTEES and its members, the TIAA PLAN INVESTMENT REVIEW COMMITTEE and its members, and JOHN DOES 1–30,<br><br>          Defendants. | Case No. 25-CV-4228-VSB |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTION TO DISMISS THE COMPLAINT</u>

## <u>TABLE OF CONTENTS</u>

**Pages**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

I.      TIAA and The Plans. ........................................................................................... 2

II.     The Plans' Investment Options. ......................................................................... 3

III.    Revenue Credits Returned to the Plans and Participants. ................................ 6

IV.     Prior Litigation and Settlement Release. .......................................................... 8

V.      Plaintiff's Allegations ......................................................................................... 9

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT ................................................................................................................... 10

I.      Count I Does Not State a Claim for Fiduciary Breach with Respect to the Fees
        of the CREF Funds ............................................................................................ 10

        A.     Plaintiff's Allegations Fail to Support an Inference of Breach with
               Respect to the Plans' Continued Offering of the R3 Classes of CREF
               Funds. ...................................................................................................... 11

        B.     Plaintiff Fails to Plausibly Allege Any Disloyal Conduct with Respect
               to the Plans' Fees for the CREF Funds. ................................................. 14

II.     Counts II and III Fail to State a Claim With Respect to the Growth Fund. ..... 16

        A.     Allegations of Investment Underperformance Alone Raise No
               Inference of Imprudence. ....................................................................... 17

        B.     Plaintiff's Performance Allegations Are Deficient. ............................... 19

               1.     Plaintiff Fails to Plead Substantial or Consistent
                      Underperformance. ....................................................................... 19

               2.     Plaintiff's Performance Allegations Are Impermissibly Tainted
                      by Hindsight Bias. ......................................................................... 22

III.    Count IV Does Not State a Viable Prohibited Transaction Claim ................... 23

        A.     Plaintiff's Prohibited Transaction Claims Premised on Defendants
               "Maintaining the CREF Funds in the Plans" Are Time-Barred. ............ 24

        B.     Even If Not Time-Barred, Count IV Fails to Allege Key Elements of a
               Prohibited Transaction Claim. ................................................................ 26

               1.     Plaintiff Fails to Allege a "Transaction." ................................... 26

               2.     Plaintiff Fails to Demonstrate That the Defendants Are Parties
                      in Interest. .................................................................................... 26

               3.     Plaintiff Fails to Carry His Burden to Establish That ERISA
                      § 408(c)(2) Does Not Apply. ......................................................... 27

4.      Plaintiff Fails to Plead a Necessary Element of His Claims
Under ERISA §§ 406(a)(1)(D) and 406(b)(1). ....................................... 28

IV.     Count V Should Be Dismissed Because It Is Derivative of Counts I Through III. .......... 29

CONCLUSION..................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Pages**

**Cases**

*Anderson v. Advance Publ'ns, Inc.*,
  2023 WL 3976411 (S.D.N.Y. June 13, 2023)........................................................................ 19

*Antoine v. Marsh & McLennan Cos.*,
  2023 WL 6386005 (S.D.N.Y. Sept. 30, 2023).................................................................. 18, 22

*Baumeister v. Exelon Corp.*,
  2023 WL 6388064 (N.D. Ill. Sept. 29, 2023)...................................................................... 13

*Bekker v. Neuberger Berman Group LLC*,
  2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018)........................................................... 13, 15, 20

*Bloom v. AllianceBernstein L.P.*,
  725 F. Supp. 3d 325 (S.D.N.Y. 2024)................................................................................. 26

*Boyette v. Montefiore Med. Ctr.*,
  2023 WL 7612391 (S.D.N.Y. Nov. 13, 2023)
  *aff'd*, 025 WL 48108 (2d Cir. Jan. 8, 2025)..................................................................... 14, 29

*Brown v. Am. Life Holdings, Inc.*,
  190 F.3d 856 (8th Cir. 1999)............................................................................................... 24

*Caputo v. Pfizer, Inc.*,
  267 F.3d 181 (2d Cir. 2001)................................................................................................ 24

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002).................................................................................................. 3

*Cho v. Prudential Ins. Co. of Am.*,
  2021 WL 4438186 (D.N.J. Sept. 27, 2021)......................................................................... 20

*Cunningham v. Cornell Univ.*,
  145 S. Ct. 1020 (2025)......................................................................................................... 28

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013)............................................................................................... 26

*Disberry v. Emp. Rels. Comm. of Colgate-Palmolive Co.*,
  646 F. Supp. 3d 531 (S.D.N.Y. 2022)................................................................................... 3

*Dorman v. Charles Schwab Corp.*,
  2019 WL 580785 (N.D. Cal. Feb. 8, 2019)......................................................................... 22

*Dupree v. Prudential Ins. Co. of Am.*,
   2007 WL 2263892 (S.D. Fla. Aug. 7, 2007)........................................................ 14, 17

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) .................................................................................................. 10

*Forman v. TriHealth, Inc.*,
   40 F.4th 443 (6th Cir. 2022)..................................................................................... 18

*Forman v. TriHealth, Inc.*,
   563 F. Supp. 3d 753 (S.D. Ohio 2021),
   *aff'd in relevant part*, 40 F.4th 443 (6th Cir. 2022) .......................................... 20, 22

*Gonzalez v. Northwell Health, Inc.*,
   632 F. Supp. 3d 148 (E.D.N.Y. Sept. 30, 2022)................................................... 19, 20

*Guzman v. Bldg. Serv. 32BJ Pension Fund*,
   2023 WL 8039261 (S.D.N.Y. Nov. 20, 2023),
   *aff'd*, 2024 WL 4431100 (2d Cir. Oct. 7, 2024)................................................. 15, 16

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022) ........................................................................................ 9, 12, 16

*Hughes v. Nw. Univ.*,
   63 F.4th 615 (7th Cir. 2023)..................................................................................... 12

*Humphries v. Mitsubishi Chem. Am., Inc.*,
   2024 WL 4711296 (S.D.N.Y. Nov. 7, 2024) ............................................................ 3

*In re Bausch & Lomb Inc. ERISA Litig.*,
   2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008) ......................................................... 3

*In re G.E. ERISA Litig.*,
   2019 WL 5592864 (D. Mass. Oct. 30, 2019).......................................................... 25

*In re M&T Bank Corp. ERISA Litigation*,
   2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018) ...................................................... 11

*Kopp v. Klein*,
   894 F.3d 214 (5th Cir. 2018).................................................................................... 15

*Lalonde v. Mass. Mut. Ins. Co.*,
   728 F. Supp. 3d 141 (D. Mass. 2024) ..................................................................... 25

*Matney v. Barrick Gold of N.A.*,
   80 F.4th 1136 (10th Cir. 2023)............................................................................ 13, 14

*Matousek v. MidAmerican Energy Co.*,
   51 F.4th 274 (8th Cir. 2022) ................................................................................ 18

*Parmer v. Land O'Lakes, Inc.*,
   518 F. Supp. 3d 1293 (D. Minn. 2021) ................................................................. 11

*Patterson v. Cap. Grp. Cos.*,
   2018 WL 748104 (C.D. Cal. Jan. 23, 2018) .................................................... 15, 25

*Patterson v. Morgan Stanley*,
   2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................. 16, 17, 19, 20, 22, 23

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ...................................................... 9, 10, 17, 18, 22, 23

*Rinehart v. Lehman Bros. Holdings Inc.*,
   817 F.3d 56 (2d Cir. 2016) ................................................................................... 29

*Singh v. Deloitte LLP*,
   123 F.4th 88 (2d Cir. 2024) .................................................................................. 12

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022) ............................................................................... 18

*Sulyma v. Intel Corp. Inv. Pol'y Comm.*,
   909 F.3d 1069 (9th Cir. 2018),
   *aff'd*, 589 U.S. 178 (2020) .................................................................................. 24

*Vargas v. Cap. One Fin. Advisors*,
   2013 WL 4407094 (S.D.N.Y. Aug. 15, 2013),
   *aff'd*, 559 F. App'x 22 (2d Cir. 2014) ............................................................... 8, 9

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ....................................................... 12

*Wright v. Or. Metallurgical Corp.*,
   360 F.3d 1090 (9th Cir. 2004) .............................................................................. 26

**Statutes**

29 U.S.C. § 1104(a)(1)(B) (ERISA § 404(a)(1)(B)) ................................................... 18

29 U.S.C. § 1106 (ERISA § 406) ........................................................ 23, 24, 27, 28

29 U.S.C. § 1108(b)(2) (ERISA § 408(b)(2)) ........................................................... 28

29 U.S.C. § 1108(c)(2) (ERISA § 408(c)(2)) ..................................................... 27, 28

29 U.S.C. § 1113 (ERISA § 413) ............................................................................ 24, 26

**Other Authorities**

56 Fed. Reg. 10,724 (Mar. 13, 1991) ............................................................................ 15

H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974) ........................................................... 15

## INTRODUCTION

The Complaint should be dismissed because it fails to state a plausible claim that Defendants[1] breached any fiduciary duties with respect to the two defined contribution retirement plans sponsored by TIAA that are the subject of this case: the TIAA Code Section 401(k) Plan ("401(k) Plan") and the TIAA Retirement Plan ("Retirement Plan") (collectively, the "Plans").

Plaintiff alleges that Defendants acted disloyally and imprudently, and caused the Plans to engage in prohibited transactions, in violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), by (i) retaining allegedly higher-cost share classes of certain TIAA-affiliated investments in the Plans; and (ii) failing to remove from the Plans the TIAA-affiliated Growth Fund. Plaintiff's claims are unsupported by the Complaint.

Plaintiff's share-class claim is based on the allegation that the Plans continued to offer the R3 share classes ("R3 Classes") of TIAA-affiliated funds even after lower-cost R4 share classes ("R4 Classes") were added to the Plans. But Plaintiff's fee allegations ignore that TIAA timely added the lowest-cost R4 Classes to the Plans, and credits back to the Plans and to participants millions of dollars in fee revenue generated by the Plan's investments in the R3 Classes, undercutting Plaintiff's theory that Defendants retained the R3 Classes in favor of TIAA's "financial self-interest." Compl. ¶70. Plaintiff's share-class allegations thus wildly overstate the fees that Plaintiff challenges, and support no inference of breach.

Plaintiff's investment performance claim compares the Growth Fund's performance to that of cherry-picked alternatives to conclude that Defendants acted out of "self-interest" and had

---

[1] Teachers Insurance and Annuity Association of America ("TIAA"), the TIAA Board of Directors, and the TIAA Plan Investment Review Committee ("PIRC") (collectively, "Defendants").

"an imprudent process." Compl. ¶¶145, 153.  The Complaint supports neither inference.  Half of the Plans' investment options are unaffiliated with TIAA, which belies any suggestion that Defendants favored TIAA-affiliated funds.  And the alleged annualized underperformance is of such small magnitude that it cannot support any inference of breach as a matter of law.  Moreover, Plaintiff's comparisons are the type of hindsight-based allegations that courts roundly agree cannot support any inference about the fiduciaries' process.

Plaintiff's breach claims (Counts I, II, III, and V) therefore fail as a matter of law.  Plaintiff's prohibited transaction claim (Count IV) also fails because it is time-barred and because the Complaint fails to plausibly allege required elements of the claim.  The Complaint should be dismissed with prejudice.

## <u>BACKGROUND</u>

### I.    TIAA and The Plans.

TIAA is a New York life insurance company that was founded by the Carnegie Foundation in 1918 and, for the past 107 years, has operated without profit pursuant to its charter as the leading provider of retirement plan services for academic, medical, research, and governmental institutions.[2]  TIAA offers eligible employees the opportunity to save for retirement in the Plans.  TIAA contributes generously to these Plans: it matches 100% of the first 3% of base salary that 401(k) Plan participants contribute, and contributes between 5.00% and

---

[2] TIAA, Our Story, https://tinyurl.com/zjvnrxes (last visited August 12, 2025); TIAA, Lifetime Income, https://tinyurl.com/4v4mhc5j (last visited August 12, 2025).  TIAA has received numerous awards for its investment vehicles and for its products and services; TIAA was also named one of the "World's Most Ethical Companies" eleven consecutive times through 2025 by the Ethisphere Institute.  TIAA, TIAA Ranked Among the World's Most Ethical Companies, https://tinyurl.com/hs9srw6c.

12.50% of base salary to the Retirement Plan. Ex. 1 (401(k) Plan 2023 Form 5500) at MTD-0007; Ex. 2 (Retirement Plan 2023 Form 5500) at MTD-0025.[3]

In addition to sponsoring the Plans, TIAA provides recordkeeping and administrative services to the Plans. Compl. ¶25. While TIAA typically charges plans for such services, TIAA employees receive these services for free. TIAA's recordkeeping contract with respect to the Plans makes clear that "TIAA may not receive any compensation (direct, indirect or otherwise) from the [Plans] for providing [recordkeeping and administrative] services." Ex. 3 (Recordkeeping Agreement ("RKA")) §8.1.A. TIAA's compensation for providing services to the Plans is "paid by the Employer" and not by the Plans.

## II.    The Plans' Investment Options.

The Plans offer participants the ability to invest in a diverse array of investment options that throughout the putative class period have included: a suite of portfolios that provide an age-appropriate asset allocation; 6 index-based collective investment trusts managed by unaffiliated investment adviser; 19 mutual funds managed by TIAA affiliates or numerous unaffiliated investment advisers; and a self-directed brokerage account that allows participants to invest in over 7,000 mutual funds managed by a range of advisers. Ex. 1 at MTD-0007, MTD-0016-17.[4]

---

[3] The Exhibits to the Declaration of Benjamin Reilly filed herewith may be considered on this Motion because they are either publicly available (Forms 5500 filed annually with the Department of Labor (DOL); fund prospectuses; Morningstar data) or integral to the Complaint (the Recordkeeping Agreement, which is central to Plaintiff's allegation that Plan participants invested in the R3 Classes paid excessive fees; plan documents and contracts through which Plaintiff invests in the Plans). *Humphries v. Mitsubishi Chem. Am., Inc.*, 2024 WL 4711296, at *5 (S.D.N.Y. Nov. 7, 2024) ("tak[ing] judicial notice of the Plan's annual Form 5500 reports"); *In re Bausch & Lomb Inc. ERISA Litig.*, 2008 WL 5234281, at *1 (W.D.N.Y. Dec. 12, 2008) (taking judicial notice of SEC filings); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (considering document "integral" to complaint); *Disberry v. Emp. Rels. Comm. of Colgate-Palmolive Co.*, 646 F. Supp. 3d 531, 538-39 (S.D.N.Y. 2022) (considering services agreement "central" to claim).
[4] Where the Forms 5500 for the 401(k) Plan and Retirement Plan are identical, only the 401(k) Plan's is cited.

Participants direct the investment of their contributions into the various investment options offered by the Plans and are credited with the return on those investments.  *Id.*

Plan participants invest their Plan contributions in certain TIAA-affiliated investment options through annuity contracts issued by TIAA and companion certificates issued by TIAA's companion organization, the College Retirement Equities Fund ("CREF"), which is a registered investment company under the Investment Company Act of 1940.  Ex. 1 at MTD-0006; Ex. 4 (Byrne TIAA Retirement Annuity Contract and CREF Certificate) at MTD-0075, MTD-0097, MTD-0115.

CREF is composed of numerous separate pools of money, or separate accounts—the "CREF Funds"—in which investors may invest.  Compl. ¶47.  Each separate account is an investment fund that has its own investment objective and strategy.  *Id.*  CREF offers eight investment strategies as separate accounts:  the CREF Stock Fund, CREF Money Market Fund, CREF Social Choice Fund, CREF Global Equities Fund, CREF Growth Fund, CREF Equity Index Fund, CREF Inflation-Linked Bond Fund, and CREF Core Bond Fund.  Compl. ¶11.[5]

Plan participants historically invested in CREF Funds through individual annuity contracts and certificates issued by TIAA and CREF to each individual participant.  Compl. ¶47, n.3; Ex. 1 at MTD-0012; Ex. 4 at MTD-0097 (identifying "participant" as "owner" of the CREF certificate).  Under such contracts and certificates, participants determine how their contributions will be allocated among the CREF Funds.  Ex. 1 at MTD-0006; Ex. 4 at MTD-0097 ("[y]ou may allocate your CREF premiums to one or more of the CREF accounts").

---

[5] The Complaint refers to the CREF Funds as "Funds" but as separate accounts of CREF they are, in fact, the CREF Stock Account, CREF Money Market Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Index Account, CREF Inflation-Linked Bond Account, and CREF Core Bond Account.  Ex. 8 (CREF 2021 Prospectus) at MTD-0212.

Prior to November 2022 (and during the putative class period relevant to the Complaint), the Plans made available to participants the R3 Classes of the CREF Funds through the individual contracts and certificates issued to Plan participants.  Compl. ¶¶13-15; Ex. 6 (401(k) Plan 2022 Form 5500) at MTD-0192; Ex. 7 (Retirement Plan 2022 Form 5500) at MTD-0202. The R3 Classes were the lowest-cost classes of the CREF Funds at that time.[6]  In September 2022, CREF introduced the R4 Classes of the CREF Funds, Compl. ¶¶13-14, which are only available to participants investing through certain TIAA and CREF contracts and certificates.[7] Following CREF's introduction of the R4 Classes, in November 2022 TIAA promptly added the contracts eligible to invest in the R4 Classes to the Plans.  Compl. ¶¶13-16; Ex. 1 at MTD-0009.

Since the Plans became eligible to invest in R4 Classes of the CREF Funds in November 2022, new money contributions into the CREF Funds are within the R4 Classes and no new contributions can be made into R3 Classes.  Ex. 1 at MTD-0006-7.  However, because the contracts through which Plan participants invested in the R3 Classes are individually-owned by participants, participants themselves must initiate transfers.  TIAA could not unilaterally transfer such assets.  Ex. 4 at MTD-0097.

The CREF Funds are highly-rated, well-performing funds.  For example, as of June 30, 2025:

- The CREF Stock Fund had received a 5-star ranking from Morningstar and performed in the top quartile of its peers on a 1-, 3-, 5-, 10-, and 15-year basis.

---

[6] *See, e.g.*, Ex. 8 at MTD-0212-13.
[7] *See* Compl. ¶52 ("TIAA offers the R4 Classes to . . . retirement accounts that have entered into a recordkeeping services agreement with TIAA."); Ex. 9 (CREF 2024 Prospectus) at MTD-0229 ("Eligibility for Class R4 is based upon whether a participant institution has adopted Retirement Choice/Retirement Choice Plus Contracts and entered into a recordkeeping services agreement with TIAA.").

- The CREF Inflation-Linked Bond Account had received a 5-star ranking from Morningstar and outperformed its benchmark and performed in the top quartile of its peers on a 1-, 3-, 5-, 10- and 15-year basis.

- The CREF Global Equities Fund had received a 4-star ranking from Morningstar and outperformed its benchmark and performed in the top quartile of its peers on a 3-, 5-, 10-, and 15-year basis.

- The CREF Growth Fund had received a 4-star ranking from Morningstar and performed in the top quartile of its peers on a 3- and 15-year basis.[8]

### III.  Revenue Credits Returned to the Plans and Participants.

Like mutual funds, the CREF Funds charge investors an asset-based fee referred to as an expense ratio.  The expense ratios for the CREF Funds in the Plans are in the range of .185% - .255% (R3 Classes) and .030%-.100% (R4 Classes).  Compl. ¶72.  TIAA, as recordkeeper, provides Plan Services Expense Offsets ("Offsets") to plans recordkept by TIAA with TIAA and/or CREF proprietary annuity products on their menus to assist plan sponsors in satisfying TIAA's recordkeeping fees.  Ex. 3 §8.1.A.ii.a.  Offsets are determined by TIAA solely in its capacity as a record keeper and are supported by TIAA entirely from its surplus.  *Id.*  The Offsets provided for the R3 Classes of the CREF Funds is .100%.  Ex. 3 at MTD-0048.[9]  Offsets provided by TIAA as a result of the Plans' investments are not retained by TIAA; rather, TIAA credits such amounts to the Plans' revenue credit account.  Ex. 3 §§8.1.A.ii.b, 8.1.A.ii.c, 8.2; *see also* Ex. 1 at MTD-0009, MTD-0014.  Those revenue credits are in turn allocated to participant accounts.  Ex. 3 §§8.1.A.ii.b, 8.2.

The Plans' Forms 5500 reflect that TIAA has credited back to the Plans millions of dollars in revenue credits over the putative class period.  As shown in the tables below, between 2019 and 2023, TIAA deposited over $9.5 million of revenue credits to the 401k Plan and $17.9

---

[8] Exs. 10-13 (Morningstar data).
[9] TIAA does not provide Offsets for the R4 Classes.  Ex. 3 at MTD-0051.

million to the Retirement Plan—which represents a portion of revenue that may be available for administrative expenses—all of which was allocated back to participant accounts.

**401(k) Plan[10]**

| Year | Deposit to the Revenue Credit Account | Allocation to Participants |
|------|---------------------------------------|----------------------------|
| **2019** | $254,190 | $194,693 |
| **2020** | $2,044,351 | $1,783,224 |
| **2021** | $2,195,597 | $2,118,347 |
| **2022** | $2,041,813 | $2,570,940 |
| **2023** | $2,979,594 | $2,982,917 |
| **TOTAL** | **$9,515,545** | **$9,650,121** |

**Retirement Plan[11]**

| Year | Deposit to the Revenue Credit Account | Allocation to Participants |
|------|---------------------------------------|----------------------------|
| **2019** | $1,381,795 | $1,356,977 |
| **2020** | $4,178,248 | $4,038,768 |
| **2021** | $3,419,435 | $2,772,783 |
| **2022** | $4,418,903 | $5,387,474 |
| **2023** | $4,550,778 | $4,527,178 |
| **TOTAL** | **$17,949,159** | **$18,083,180** |

---

[10] Exs. 1, 6, 14-16 (401(k) Plan Forms 5500 2019-2023).
[11] Exs. 2, 7, 17-19 (Retirement Plan Forms 5500 2019-2023).

IV.    **Prior Litigation and Settlement Release.**

In October 2015, participants in the Plans filed an ERISA class action with allegations similar to those asserted here.  *See* Compl., *Richards-Donald v. TIAA et al.*, No. 15-cv-08040 (S.D.N.Y. Oct. 13, 2015), ECF No. 1.  The *Richards-Donald* plaintiffs alleged that TIAA violated ERISA by selecting only TIAA-affiliated investments for the Plans.

*Richards-Donald* settled in 2017.  Ex. 20 (*Richard-Donald* Stipulation of Settlement, No. 15-cv-08040, ECF No. 46-1).  In connection with settlement negotiations, TIAA provided tens of thousands of pages of documents to the *Richards-Donald* plaintiffs, including plan documents, consultant reports, meeting minutes and materials related to TIAA's fiduciary committees, and fee information.  *Richards-Donald* class counsel and TIAA reached settlement terms that included $5 million in payments to Plan participants and structural changes to the Plans.  TIAA agreed, among other things, to:

- Add 10 unaffiliated investment options to the Plans' investment menus;

- Permanently codify its policy that Plan fiduciaries receive no bonus or other compensation as a result of the Plans' investment in TIAA-affiliated investments; and

- Retain an independent investment consultant to advise the PIRC with respect to Plan investments.

Ex. 20 at ¶¶59, 61-62.

The *Richards-Donald* Stipulation was approved by an independent fiduciary and then by the Court on October 20, 2017.  No. 15-cv-08040, ECF No. 56.  Plaintiff Byrne was a *Richards-Donald* class member and received a settlement payment in the amount of $150.04 in May 2018.[12]

---

[12] Ex. 21 (Smith Declaration re: Class Payments in the Matter *Richards-Donald v. TIAA*).  The Smith Declaration is properly considered on this motion for the limited purpose of identifying the recipients of the Court-ordered class notice.  *See, e.g., Vargas v. Cap. One Fin. Advisors*,

V.    **Plaintiff's Allegations**

Plaintiff was a participant in the Plans during the putative class period and holds an

individual TIAA annuity contract and CREF certificate through which he chose to invest in R3

Classes of CREF Funds and the Growth Fund, among other investments.  Compl. ¶¶24, 32, 129.

Plaintiff also holds a TIAA Retirement Choice Plus Annuity Contract and companion CREF

Certificate that is eligible to invest in R4 Classes.  Ex. 5 (Byrne Retirement Choice Plus Annuity

Certificate).  Plaintiff has not elected to transfer his balances in the R3 Classes into the R4

Classes.

In Count I, Plaintiff alleges that Defendants breached ERISA's fiduciary duties of

prudence and loyalty by not removing the allegedly higher-cost R3 Classes of the CREF Funds

from the Plans after the R4 Classes were introduced in September 2022.  In Counts II and III,

Plaintiff alleges that Defendants breached ERISA's fiduciary duties of loyalty and prudence by

not removing the allegedly underperforming CREF Growth Fund as of the beginning of the

putative class period in 2019.  In Count IV, Plaintiff alleges that "[b]y maintaining the CREF

Funds in the Plans," Defendants engaged in transactions prohibited by ERISA.  Count V asserts

a derivative claim that Defendants failed to monitor other Plan fiduciaries.

## **LEGAL STANDARD**

As the Supreme Court has explained, "the circumstances facing an ERISA fiduciary will

implicate difficult tradeoffs, and courts must give due regard to the range of reasonable

judgments a fiduciary may make based on her experience and expertise."  *Hughes v. Nw. Univ.*

("*Hughes I*"), 595 U.S. 170, 177 (2022).  To withstand a motion to dismiss, "the complaint must

demonstrate more than a sheer possibility that a defendant has acted unlawfully."  *Pension*

---

2013 WL 4407094, at *2 (S.D.N.Y. Aug. 15, 2013) (granting motion to dismiss based on res
judicata), *aff'd*, 559 F. App'x 22, 27 (2d Cir. 2014).

*Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013).  The complaint must allege "nonconclusory factual content raising a *plausible* inference of misconduct" and must not rely on "the vantage point of hindsight."  *Id.*  Any "circumstantial factual allegations" "must give rise to a 'reasonable inference' that the defendant committed the alleged misconduct, thus permit[ting] the court to infer more than the mere possibility of misconduct[.]"  *Id.* at 718-19.

A motion to dismiss is an "important mechanism for weeding out meritless claims" that impermissibly seek to second-guess decisions that are within the range of permissible fiduciary judgments.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425-26 (2014).  "[C]areful, context-sensitive scrutiny of a complaint's allegations," is the appropriate way to accomplish the "important task" of "divid[ing] the plausible sheep from the meritless goats."  *Id.*  Absent careful scrutiny, there is a serious risk that a "plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value."  *PBGC*, 712 F.3d at 719 (alteration in original).

## **ARGUMENT**

**I.    Count I Does Not State a Claim for Fiduciary Breach with Respect to the Fees of the CREF Funds.**

Count I alleges that Defendants acted imprudently and disloyally by failing to ensure that Plan participants paid the lowest available fees for the CREF Funds in the Plans.  Compl. ¶¶139-40.  Plaintiff offers no factual allegations concerning Defendants' actual process for overseeing Plan fees.  Instead, Plaintiff asks the Court to infer an imprudent and disloyal process from allegations that Defendants failed to replace the R3 Classes of the CREF Funds with the R4 Classes "as soon as the R4 Classes were launched in September 2022," the R3 Classes had "higher fees" than R4 Classes, and Defendants "had a financial self-interest" in the higher-cost

R3 Classes.  *Id.* ¶¶70-71.  He asserts Count I on behalf of a putative class of participants who invested in R3 Classes from September 16, 2022 through the date of judgment.  *Id.* ¶129(a).

Count I should be dismissed because the Complaint's non-conclusory allegations do not state a plausible claim that Defendants employed an imprudent or disloyal process for overseeing the Plans fees for the CREF Funds.

### A.    Plaintiff's Allegations Fail to Support an Inference of Breach with Respect to the Plans' Continued Offering of the R3 Classes of CREF Funds.

Plaintiff alleges that "Defendants charge[d] the Plans' participants who own the R3 Classes higher fees than they did other shareholders outside the Plans who own the R4 Classes."  Compl. ¶139.  This allegation fails to state a claim for several reasons.

First, courts only infer a breach of duty with respect to share class allegations where a plaintiff alleges that a lower-cost share class became available and the fiduciaries either failed to make it available or were significantly delayed in doing so.  In *In re M&T Bank Corp. ERISA Litigation*, for example, the court denied a motion to dismiss where plaintiffs alleged that throughout the class period, the defendants "had the opportunity to switch" share classes" but they "either waited multiple years before switching to the lower fee share classes or never switched."  2018 WL 4334807, at *7 (W.D.N.Y. Sept. 11, 2018).  Similarly, *Parmer v. Land O'Lakes, Inc.* held that allegations that lower-cost shares were added to a plan three years after they were first available raised a plausible inference that "defendants were imprudent to not investigate [lower-cost] shares sooner."  518 F. Supp. 3d 1293, 1304 (D. Minn. 2021).

Plaintiff does not and cannot allege that Defendants failed to timely add the lower-cost R4 Classes to the Plans as soon as they became available in September 2022.  To the contrary, Plaintiff *admits* that Defendants added the R4 Classes to the Plans once they became available, without any suggestion of delay.  *See* Compl. ¶¶13-14, 71 (alleging that the R4 Classes first

became available on September 16, 2022 and by year-end 2023 had amassed substantial Plan assets). The Plans' publicly-available regulatory filings further confirm that the fiduciaries promptly added the R4 Classes when they became available, froze the existing R3 Classes to new contributions, and gave participants the opportunity to transfer their assets out of the R3 Classes. *Supra* p. 5. The only plausible inference to be drawn from these facts is that the fiduciaries were actively overseeing Plan investment fees. *Cf. White v. Chevron Corp.*, 2016 WL 4502808, at *11 (N.D. Cal. Aug. 29, 2016) (dismissing imprudence claims where investment option changes refuted claims).

Courts "should not hesitate to dismiss an ERISA claim for breach of the duty of prudence" where, as here, "a plan fiduciary has actually performed the requisite diligence in monitoring plan expenses and fund prudence." *Hughes v. Nw. Univ.* ("*Hughes II*"), 63 F.4th 615, 630 (7th Cir. 2023).

Second, Plaintiff's allegation that Defendants acted imprudently by not "replac[ing] the R3 Classes with the R4 Classes in the Plans" (Compl. ¶70) fails to state a claim because Plaintiff ignores relevant context. "[T]he prudence inquiry is necessarily context specific and 'the circumstances facing an ERISA fiduciary,' often enough, 'will implicate difficult tradeoffs.'" *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024) (quoting *Hughes I*, 595 U.S. at 177). To survive a motion to dismiss, a plaintiff must provide enough information about the challenged investments and alleged alternatives for the court to engage in the necessary context-sensitive analysis. *Hughes I*, 595 U.S. at 177. As such, courts do not find plausible inferences of fiduciary misconduct based on "allegation[s] of a cost disparity alone, without some consideration of the surrounding context." *Singh*, 123 F.4th at 95.

In some cases, the "context" missing from a plaintiff's fee allegations has been a failure to account for the difference between the strategies of the funds being compared. For example, in *Matney v. Barrick Gold of N.A.*, the Tenth Circuit held that "[a] court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists" without facts showing the "services being compared are, indeed, comparable." 80 F.4th 1136, 1149 (10th Cir. 2023). Likewise, the court in *Bekker v. Neuberger Berman Group LLC*, rejected allegations that a challenged fund's fees compared unfavorably to an alternative absent "alleg[ations] that the two funds employed similar operations or investment strategies." 2018 WL 4636841, at *7 (S.D.N.Y. Sept. 20, 2018).

Here, the relevant context that Plaintiff ignores is multi-fold. Plaintiff ignores that the contracts and certificates through which participants invested in the R3 Classes are individually-owned, and thus changes to share class selection must be made by participants. *Supra* pp. 4-5. Plaintiff also ignores that he (like other Plan participants) has had the ability to transfer his Plan assets out of any R3 Classes and has failed to do so. *Id*. Plaintiff further ignores the fact that Offsets provided by TIAA as a result of the Plans' investments are credited back to the Plans and to participants. *Id*. Nowhere in his Complaint does Plaintiff account for—or even acknowledge—these revenue credits. In this regard, Plaintiff fails to account for the context of R3 Class investors' total expenses. Plaintiff cannot sustain an excessive fee claim where he fails even to plead the net cost to participants of investing in R3 Classes. If Plaintiff did account for the revenue credits, Plaintiff would have to concede that his complaint about the fees of the R3 Classes compared to those of the R4 Classes is spurious. *See Baumeister v. Exelon Corp.*, 2023 WL 6388064, at *9 n.6 (N.D. Ill. Sept. 29, 2023) ("minor variations" of 0.10% to 0.20% in fees "on their own, are insufficient to demonstrate imprudence").

This is precisely the kind of context that has caused courts to dismiss similar fee claims. For example, in *Matney*, the plaintiffs asserted similar share-class claims, and the Tenth Circuit affirmed dismissal because documents incorporated by reference into the complaint established that the plan had "not actually offered a more costly fund" but rather, that "revenue sharing provided plan participants with a discount" when it used a purportedly higher-cost share class. 80 F.4th at 1151.  Similarly, in *Boyette v. Montefiore Medical Center*, another court within this District found fee comparisons between share classes "unavailing and insufficient to plead a plausible breach of the fiduciary duty of prudence" because the higher-cost share class included a component that benefitted participants.  2023 WL 7612391, at *6 (S.D.N.Y. Nov. 13, 2023), *aff'd*, 2025 WL 48108 (2d Cir. Jan. 8, 2025).  The *Boyette* court considered the plan's Forms 5500, which explained that the plan received revenue sharing from the more expensive share classes and that the proceeds were credited back to the participants that invested in those funds. *Id.*  The court dismissed the share-class allegations because the Forms 5500 confirmed that "[t]here is no question that the plaintiffs received a benefit from the higher cost share classes [in the form of revenue credits]."  *Id.*  This Court should dismiss Count I on the same ground.

### B. Plaintiff Fails to Plausibly Allege Any Disloyal Conduct with Respect to the Plans' Fees for the CREF Funds.

Lacking any facts demonstrating imprudent conduct, Plaintiff falls back on a the theory that "TIAA had a financial self-interest not to replace the R3 Classes with the R4 Classes in the Plans."  Compl. ¶70.  Plaintiff's allegations fail to support any such inference of disloyalty.

First, it is well established that merely offering an affiliated fund in a plan does not "give rise to an inference of disloyalty."  *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007).  Congress and the DOL have both recognized it is "common practice" for financial services companies' own plans to offer participants the opportunity to

invest in their employers' investment funds.  H.R. Conf. Rep. No. 93-1280, at 5093 (Aug. 12, 1974); *accord* 56 Fed. Reg. 10,724, 10,730 (Mar. 13, 1991).  Thus, courts have repeatedly held that "sponsor-affiliated funds are permitted under ERISA and do not, standing alone, support an inference that a defendant breached its fiduciary duties by including such a fund."  *Bekker*, 2018 WL 4636841, at *6; *see also Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018) (affirming dismissal, holding that "the potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty").

Even the allegation that a plan sponsor receives purported financial benefits from including higher-cost share classes of proprietary funds is insufficient to state a disloyalty claim. In *Patterson v. Capital Group Companies*, the court held that the allegation "that all or most of the challenged funds were Defendants' own financial products" was "insufficient, when viewed in context, to create a plausible inference of wrongdoing" for use of higher-cost share classes. 2018 WL 748104, at *5 (C.D. Cal. Jan. 23, 2018).  Thus, TIAA's alleged "financial self-interest" in maintaining prior investments in the R3 Classes (Compl. ¶70), without more, is insufficient to support a plausible inference that Defendants acted disloyally after they made the R4 Classes available.  Indeed, the conclusory assertion of financial self-interest is particularly implausible given the relevant context—that Offsets provided by TIAA as a result of the Plans' investments in the R3 Classes are credited back to the Plan and participants.

Second, Plaintiff assumes, but does not allege factual support for, the existence of any "financial self-interest" on the part of TIAA with respect to the continued offering of the R3 Classes.  Compl. ¶70.  His theory that TIAA "earned greater fee income" from the R3 Classes is unsupported because Plaintiff fails to account for the millions of dollars in revenue that TIAA credits back to the Plans in connection with such investments.  *Supra* pp. 6-7, 13; *Guzman v.*

*Bldg. Serv. 32BJ Pension Fund*, 2023 WL 8039261, at *6 (S.D.N.Y. Nov. 20, 2023) (dismissing claim "based on a faulty predicate" that "is undermined by the documents"), *aff'd*, 2024 WL 4431100 (2d Cir. Oct. 7, 2024).  Plaintiff's allegations thus support no inference that Defendants' retention of R3 Classes in the Plans was motivated by disloyalty.

At best, Plaintiff is left with a complaint only about the manner in which Defendants managed the Plans' fees for investing in the R3 Classes—through revenue credits.  But "courts must give due regard to the *range of reasonable judgments* a fiduciary may make based on her experience and expertise."  *Hughes I*, 595 U.S. at 177 (emphasis added).  Here, there is no question that Defendants acted to ensure fees were reasonable—they secured millions of dollars in revenue credits returned to participants, immediately offered the lowest-cost R4 Classes when they became available and allowed participants to transfer existing investments into the R4 Classes.  *Supra* pp. 5-7.  At best, Plaintiff merely quibbles with the manner in which TIAA implemented the R4 Classes, by complaining that the R3 Classes should have been eliminated entirely notwithstanding that participants alone direct their investments under individually-owned contracts and certificates, and regardless of the revenue credits TIAA provides.  But there is nothing in ERISA that micromanages plan fiduciaries' conduct in such a way.

For these reasons, Count I fails to state a claim and should be dismissed.

## II.    Counts II and III Fail to State a Claim With Respect to the Growth Fund.

Counts II and III allege that Defendants breached their duties of loyalty and prudence by failing to remove the Growth Fund due to alleged underperformance.  Compl. ¶¶143-58.

With respect to his disloyalty claim (Count II), Plaintiff provides no factual support for his allegations that the TIAA Defendants had "a conflict of interest when deciding whether to include or remove the Growth Fund as an investment option for the Plans" and that they acted "in their self-interest" by retaining the Growth Fund.  Compl. ¶145.  "[A] plan fiduciary does not

breach its duty of loyalty simply by offering the plan sponsor's financial products." *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *12 (S.D.N.Y. Oct. 7, 2019); *Dupree*, 2007 WL 2263892, at *45 (practice of using proprietary funds is virtually "universal" and does not "give rise to an inference of" wrongdoing).

In addition, nothing about the Plans' structures supports a plausible inference that Defendants favored the Growth Fund because it is TIAA-affiliated.  For example, Plaintiff takes no issue with the performance of the majority of the TIAA funds in the Plans, undercutting any inference that Defendants have populated the Plans with funds that lack merit in order to favor TIAA.  Nor does Plaintiff dispute that the Plans also offer a wide range of investment options that are not affiliated with TIAA, which is entirely inconsistent with his theory that Defendants acted in TIAA's self-interest.  Moreover, while the terms of the *Richards-Donald* settlement only required TIAA to retain ten unaffiliated investment options in the Plans for a period of three years, Defendants have retained those unaffiliated funds in the Plans to this day and added two more: roughly half of the Plans' assets are invested in the twelve unaffiliated investment options available in the Plans.  *Supra* p. 8; Ex. 1 at MTD-0016-17; Ex. 2 at MTD-0034-35.  Given this unique history, the suggestion that Defendants' decision to retain the Growth Fund in 2019 and beyond can only be explained by disloyal motivations is implausible.

Thus, Plaintiff is left only with his claim (Count III) that Defendants breached their duty of prudence by failing to remove the Growth Fund.  Plaintiff's allegations fail to state a prudence claim for several reasons.

### A.    Allegations of Investment Underperformance Alone Raise No Inference of Imprudence.

ERISA requires a prudent process—not a particular outcome.  *PBGC*, 712 F.3d at 716. Markets can be unpredictable, and plan fiduciaries do not have crystal balls.  Thus, their mandate

is simply to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).  This inquiry "focuses on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."  *PBGC*, 712 F.3d at 716 (brackets omitted).  Here, Plaintiff offers zero allegations about Defendants' process and so, to state a claim for relief, he must allege facts from which the court can "reasonably infer . . . that the process was flawed."  *Id.* at 718 (quotation marks omitted).  The Complaint is not close to meeting this standard.

Count III is based entirely on Plaintiff's comparisons of the Growth Fund's performance over the putative class period and the ten preceding years to that of its benchmark and four Comparator Funds (cherry-picked out of over two hundred on the market).  Compl. ¶¶115-27, 153.  However, "courts across the country have rejected claims for breach of the fiduciary duty of prudence under ERISA where the plaintiffs allege nothing more than underperformance relative to other investment vehicles."  *Antoine v. Marsh & McLennan Cos.*, 2023 WL 6386005, at *10 (S.D.N.Y. Sept. 30, 2023).  The Sixth Circuit put it plainly: "a showing of imprudence cannot come down to simply pointing to a fund with better performance."  *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448-49 (6th Cir. 2022) (quotation marks omitted).  "Merely pointing to another investment that has performed better" "does not suffice to plausibly plead an imprudent decision."  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280-82 (8th Cir. 2022) (same).  Plaintiff's allegations that the Growth Fund underperformed benchmarks and select comparators therefore fail to state a claim because "[a]llegations of underperformance are insufficient to support Plaintiff's cause

of action for breach of the duty of prudence." *Anderson v. Advance Publ'ns, Inc.*, 2023 WL 3976411, at *3 (S.D.N.Y. June 13, 2023) (dismissing claim and collecting cases).  Count III should be dismissed as a matter of law.

> **B.    Plaintiff's Performance Allegations Are Deficient.**

Even if allegations of investment underperformance alone were sufficient to state claim for imprudence, Plaintiff's performance allegations here are deficient for several reasons.

> **1.    Plaintiff Fails to Plead Substantial or Consistent Underperformance.**

Allegations of underperformance must be "substantial" and "consistent" to "support a duty of prudence claim." *Patterson*, 2019 WL 4934834, at *10; *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 163-64 (E.D.N.Y. Sept. 30, 2022) (same).  Here, the Complaint does not allege that the Growth Fund underperformed on a substantial or consistent basis.

Plaintiff alleges "significant differences in cumulative investment returns between the Growth Fund and the Russell 1000 Growth Index as well as the Comparator Funds" "by the start of 2019."  Compl. ¶118.  But this emphasis on a "cumulative" measure is misleading by design; as the Complaint acknowledges, when examined on a non-cumulative (*e.g.*, annual) basis, any differences in annualized performance between the Growth Fund and the Complaint's benchmarks are minor.  *Id.* ¶119.  At most, Plaintiff's allegations show that as of April 30, 2019, the Growth Fund's annualized 10-year returns underperformed its benchmark, the Russell 1000 Growth Index, by just 0.41% and Plaintiff's selected Comparator Funds by between 0.77% and 1.97%.  *Id.*

 Numerous courts within the Second Circuit have recognized that "a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy" and therefore have found annualized underperformance of the magnitude Plaintiff pleads "relatively small and certainly not enough to support a claim for breach of the

duty of prudence." *Patterson*, 2019 WL 4934834, at *11 (five-year annualized underperformance of 1.14% too minor to permit a plausible inference of breach); *see also Gonzalez*, 632 F. Supp. 3d at 163-64 (same with respect to five-year annualized underperformance of approximately 2%); *Bekker*, 2018 WL 4636841, at *2, *7 (10-year annualized underperformance of 4.45% versus benchmark insufficient to state a claim of breach).[13]  Thus, Plaintiff's allegations of the Growth Fund's annualized underperformance over a 10-year period versus its benchmark and Plaintiff's Comparator Funds falls well within the range of modest underperformance that raises no inference of a fiduciary breach.

The same is true of the Complaint's allegations concerning the Growth Fund's annualized underperformance during the putative class period.  Plaintiff alleges over the period May 1, 2019 through April 30, 2025, the Growth Fund underperformed the Russell 1000 Growth Index, by 2.44% and Plaintiff's selected Comparator Funds by between 1.58% and 3.86%.  Compl. ¶125. These performance differentials support no inference of a fiduciary breach.  *See Bekker*, 2018 WL 4636841, at *2, *7 (10-year annualized underperformance of 4.45% versus benchmark insufficient to state a claim); *Cho*, 2021 WL 4438186, at *9 (five-year annualized underperformance of 3.71% insufficient).

The Complaint also fails to plead consistent underperformance.  To the contrary, the Complaint itself identifies numerous years during the putative class period where the Growth Fund *outperformed* its benchmark or the comparators that Plaintiff cherry-picked with the benefit of hindsight.  Specifically, the Complaint demonstrates that the Growth Fund outperformed its

---

[13] Courts elsewhere agree.  *See, e.g.*, *Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021) (five-year underperformance ranging from .07% to 3.71% insufficient); *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753, 764 (S.D. Ohio 2021) (underperformance of 1-2% was "simply too small to raise a plausible breach of the fiduciary duty claim"), *aff'd in relevant part*, 40 F.4th 443 (6th Cir. 2022).

benchmark and each of Plaintiff's comparator funds in two of seven periods during the putative class period.  Compl. ¶121, Table 2b (showing the Growth Fund outperformed its benchmark in 2020 and 2023, the Fidelity Blue Chip Growth in 2022 and year-to-date, the JPMorgan Large Cap Growth R6 in 2021 and 2023, Putnam Large Cap Growth R6 in 20220 and 2023, and the Vanguard Russell 1000 Growth Index I in 2020 and 2023).

The Complaint also omits the Growth Fund's outperformance in the years preceding the putative class period, selectively focusing only on cumulative returns and annualized performance.  Compl. ¶119.  This obscures the fact that data available to Defendants at the time Plaintiff alleges the Growth Fund should have been removed showed the Growth Fund outperforming its benchmark (the Russell 1000 Growth Index) and three[14] of Plaintiff's four comparators half of the time in each of the ten years leading up to the putative class period. The grey shading in the below chart reflects years in which the Growth Fund outperformed:

|  | CREF Growth[15] | Benchmark | JPMorgan | Putnam | Vanguard |
|---|---|---|---|---|---|
| 2009 | 36.54 | 37.21 | 34.81 | 41.62(Y) | Unavailable |
| 2010 | 14.98 | 16.71 | 22.91 | 17.47(Y) | Unavailable |
| 2011 | 1.19 | 2.64 | 3.18 | -3.32 | 2.47 |
| 2012 | 15.87 | 15.26 | 12.37 | 18.16 | 15.17 |
| 2013 | 35.00 | 33.48 | 33.03 | 37.18 | 33.39 |
| 2014 | 13.66 | 13.05 | 11.13 | 14.11 | 12.97 |
| 2015 | 6.47 | 5.67 | 7.94 | 1.45 | 5.57 |
| 2016 | 2.92 | 7.08 | -1.74 | 6.80 | 7.02 |
| 2017 | 31.83 | 30.21 | 38.37 | 31.45 | 30.12 |
| 2018 | -2.46 | -1.51 | 0.57 | 2.69 | -1.58 |

[14] The Fidelity Blue Chip Growth Fund is omitted because it reports yearly returns as of a unique (July 31) year-end date.

[15] The R3 Class of the Growth Fund was incepted in 2015.  Returns for 2009-2014 are for the R1 Class.  *E.g.*, Ex. 28 (CREF 2016 Prospectus) at MTD-0378.  Returns for all funds are reported from prospectuses.  *See* Exs. 22-31 (CREF Growth Fund and Benchmark), Exs. 32-41 (JPMorgan), Exs. 42-51 (Putnam), and Exs. 52-58 (Vanguard).

The fact that the Growth Fund frequently produced better annual returns than its benchmark and Plaintiff's alternatives further undermines any inference of imprudence here.  *See Patterson*, 2019 WL 4934834, at \*11 (no inference of imprudence where challenged fund "lagged" comparators in certain years but outperformed in others).  As courts have recognized, "yearly figures, which is how the data would presumably be presented to and considered by [fiduciaries]"—as opposed to returns as of a single point in time (April 30, 2019) presented in the Complaint—"is relevant [to assessing sufficiency of imprudence allegations], especially if a fund outperformed the alleged benchmark in any year."  *Forman*, 563 F. Supp. 3d at 765, *aff'd in relevant part on other grounds*, 40 F.4th at 449; *see also Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at \*6 (N.D. Cal. Feb. 8, 2019) (dismissing claim in part because at-issue funds outperformed comparators in certain years).

### 2.    Plaintiff's Performance Allegations Are Impermissibly Tainted by Hindsight Bias.

A "hindsight critique of [an investment's] returns . . . is inadequate to show a breach of fiduciary duty under ERISA."  *See PBGC*, 712 F.3d at 713, 716 (affirming dismissal).  But that is precisely what Plaintiff attempts to do here in two respects.

First, Plaintiff's selection of the Comparators Funds was itself a hindsight-infused undertaking.  Plaintiff selected four Comparator Funds from 200+ funds in Morningstar's Large Cap Growth category that he now knows outperformed the Growth Fund on a cumulative basis both prior to and during the putative class period (Compl. ¶¶18, 85, 93, 101), and asks the Court to infer that Defendants acted imprudently by retaining the Growth Fund at "the start of 2019." Compl. ¶118.  This is patently unfair: in 2019, Defendants could not have known that the Comparator Funds would produce better returns over the next six years "because past performance is no guarantee of future success."  *Antoine*, 2023 WL 6386005, at \*10.  Even if

Defendants had replaced the Growth Fund in 2019, there is no guarantee they would have selected a replacement that would outperform in the future.  Indeed, the fact that Growth Fund has outperformed 64% of its peer funds over the last five years and 75% over the last three (*see* Ex. 13) suggests that Defendants would have been hard pressed in 2019 to replace the Growth Fund with a better performing fund on a go-forward basis, further undermining the plausibility of Plaintiff's imprudence claim.

Second, Plaintiff's emphasis on cumulative returns is necessarily an impermissible "hindsight critique." *PBGC*, 712 F.3d at 713.  Plaintiff asserts that the "magnitude of [the Growth Fund's] underperformance is captured by the cumulative numbers in Table 2.b" and "[a]ll the data presented in [Table 2b] were available in real time to the TIAA Defendants throughout the Class Period."  Compl. ¶¶122-24.  Not so.  The cumulative performance Plaintiff alleges was, by definition, only available as of April 30, 2025.  Plaintiff "cannot rely on data accumulated in [2025] . . . to demonstrate imprudence with regard to breaches alleged to have occurred earlier." *Patterson*, 2019 WL 4934834, at *10.  *Patterson* is instructive.  There, as here, the plaintiffs sought to raise an inference of breach by alleging that the challenged investments underperformed benchmarks and two peer funds during the class period both on an annualized and cumulative basis. *Id.*  The court rejected that effort, holding that "Plaintiffs cannot rely on data accumulated in 2016 . . . numbers not alleged to have been available to Defendants as early as August 2010, when the class period began . . . to demonstrate imprudence with regard to breaches alleged to have occurred earlier." *Id.*  The same is true here.

For these reasons, Counts II and III should be dismissed.

## III.    Count IV Does Not State a Viable Prohibited Transaction Claim.

Count IV alleges that Defendants engaged in transactions prohibited by ERISA § 406(a) and (b), but is extraordinarily vague as to the specific transactions that Plaintiff challenges,

largely parroting the language of statute.  Count IV fails to state a viable claim for several reasons.

### A.    Plaintiff's Prohibited Transaction Claims Premised on Defendants "Maintaining the CREF Funds in the Plans" Are Time-Barred.

Count IV alleges that Defendants engaged in prohibited transactions by "maintaining the CREF Funds in the Plans."  Compl. ¶164.  Such claim is untimely.

A claim under ERISA § 406 must be brought either within six years of "the date of the last action which constituted a part of the breach or violation" or within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation," whichever is earlier.  29 U.S.C. § 1113(1)-(2).  A plaintiff has "'actual knowledge of the breach or violation' within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act."  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001).  To have actual knowledge, "a plaintiff need not have knowledge of the relevant law," but rather, "he must have knowledge of all facts necessary to constitute a claim."  *Id.*  In the case of ERISA prohibited transaction claims, courts have held that knowledge sufficient to trigger the three-year limitations period is knowledge of the transaction itself.  *Sulyma v. Intel Corp. Inv. Pol'y Comm.*, 909 F.3d 1069, 1075 (9th Cir. 2018), *aff'd*, 589 U.S. 178 (2020); *see also Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999) (holding that if a plaintiff is asserting that a "fiduciary made an *illegal* investment—in ERISA terminology, engaged in a prohibited transaction—knowledge of the transaction would be actual knowledge of the breach").

Here, Plaintiff alleges that by "maintaining the CREF Funds in the Plans" Defendants "dealt with assets of the Plans for their own account interest," and received "compensation" or "consideration."  Compl. ¶¶163-65.  The only facts material to such "transactions" are (i)

24

Defendants offered the CREF Funds in the Plans; and (ii) participants paid fees associated with the CREF Funds.  Plaintiff acknowledges having knowledge of these material facts more than three years prior to filing the Complaint.  He alleges that the CREF Funds have been offered in the Plans since 2009 and that he invested in "numerous CREF Funds" during the putative class period beginning in 2019.  Compl. ¶24.

In *Lalonde v. Massachusetts Mutual Insurance Co.*, the court held on near-identical facts that "Plaintiff's knowledge the proprietary funds were in the plan portfolio [was] sufficient to trigger the accrual of [his] prohibited transactions claims."  728 F. Supp. 3d 141, 151 (D. Mass. 2024) ("Nor would it be plausible for Plaintiff to allege she was unaware of the presence of the proprietary funds in the plan's portfolio when she admittedly invested in the funds.").  Moreover, the fact that the funds were proprietary funds would have been obvious to Plaintiff, as the funds are labeled "TIAA" or "CREF" funds.  Compl. ¶¶72-73; *Lalonde*, 728 F. Supp. 3d at 151 (plaintiff had actual knowledge of alleged prohibited transactions where funds were labeled "MassMutual"); *In re G.E. ERISA Litig.*, 2019 WL 5592864, at *3 (D. Mass. Oct. 30, 2019) (prohibited transaction claim time-barred where "funds [were] labeled as GE Funds"); *Cap. Grp. Cos.*, 2018 WL 748104, at *3 (same).

The Court may also consider the fact that Plaintiff was a member of the *Richards-Donald* class more than three years prior to suit (in 2017/2018) (*supra* pp. 8-9), which "makes it even more implausible [he] was unaware the plan contained [these] proprietary funds."  *Lalonde*, 728 F. Supp. 3d at 151 (citing plaintiff's participation in prior ERISA settlement).

Accordingly, Count IV is time-barred.

**B.    Even If Not Time-Barred, Count IV Fails to Allege Key Elements of a Prohibited Transaction Claim.**

    **1.    Plaintiff Fails to Allege a "Transaction."**

Count IV challenges "maintaining the CREF Funds in the Plans."  Compl. ¶¶164-65.
However, the "retention of affiliated funds in the Plan lineup does not qualify as a 'transaction'
under Section 1106."  *Bloom v. AllianceBernstein L.P.*, 725 F. Supp. 3d 325, 348 (S.D.N.Y.
2024) (dismissing prohibited transaction claims based on retention and fees of affiliated funds);
*Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) ("The decision by the
Oremet Defendants to *continue* to hold 15% of Plan assets in employer stock was not a
'transaction.'").  In other words, "[t]he only action that can support an alleged prohibited
transaction is the initial selection of the affiliated funds[.]"  *David v. Alphin*, 704 F.3d 327, 341
(4th Cir. 2013).  Plaintiff does not challenge the initial selection of the CREF Funds for the
Plans, which he admits took place in 2009 (Compl. ¶10) and is thus time-barred by ERISA's six-
year statute of repose.  29 U.S.C. § 1113(1).

    **2.    Plaintiff Fails to Demonstrate That the Defendants Are Parties in Interest.**

Several of Plaintiff's prohibited transaction theories are premised on purported
transactions between the Plans and "parties in interest."  Compl. ¶¶160, 163, 167.  Yet Count IV
baldly asserts but does not allege any facts supporting that all TIAA Defendants are parties in
interest of the Plans who "furnished services to the Plans and received compensation" from the
Plans.  *Id.* ¶¶163-64.

The Complaint contains no allegation about any services provided to the Plans, or any
compensation received therefor, by the PIRC or the Trustees.  The only allegation with respect to
TIAA is that TIAA served as recordkeeper for the Plans (Compl. ¶25) and Plaintiff's vague

allegation that TIAA "received compensation." *Id.* ¶163.  Count IV does not identify any such compensation, nor does it account for the fact that TIAA is prohibited under its recordkeeping agreement from receiving compensation for its administrative and recordkeeping services to the Plans, and in fact credits all such revenue received in connection with the Plans' investments back to participants. *Supra* pp. 3, 6-7.  Absent these essential elements, Plaintiff fails to state a claim under ERISA § 406(a).

### 3.    Plaintiff Fails to Carry His Burden to Establish That ERISA § 408(c)(2) Does Not Apply.

Even if Plaintiff had adequately pleaded transactions by the TIAA Defendants involving the receipt of compensation in connection with the Plans, Plaintiff still fails to meet his burden of demonstrating that such compensation was unreasonable.

Plaintiff contends that "maintaining the CREF Funds in the Plans" constituted a prohibited transaction under ERISA §§ 406(a) and (b), which bar certain transactions between a plan and a "party in interest" or a "fiduciary." *See* 29 U.S.C. § 1106(a), (b).  Section 408(c)(2), however, provides that "[n]othing in section 1106 . . . shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered[.]" 29 U.S.C. § 1108(c)(2).  This makes clear that a fiduciary's receipt of reasonable compensation for its services is not prohibited by section 406 at all.  Plaintiff's failure to plausibly allege that Defendants received unreasonable compensation is fatal to Count IV.

As an initial matter, Count IV contains no allegations whatsoever about the level of compensation received by any TIAA Defendant in connection with the Plans, let alone compensation net of the revenue that TIAA credits back to participants.  Plaintiff does not challenge the fees of the R4 Classes of the CREF Funds in Count IV or anywhere in the Complaint.  To the extent that Count IV is premised on Plaintiff's allegations elsewhere in the

Complaint concerning the fees of the R3 Classes of CREF Funds, Plaintiff does not allege and cannot allege that such fees were unreasonable in light of the revenue credits. *See supra* pp. 6-7, 13-14. Plaintiff has therefore failed to carry his burden to establish that section 408(c)(2) does not apply here. Plaintiff's failure dooms Count IV at the pleading stage because section 408(c) constitutes part of the statutory definition of a prohibited transaction as to which Plaintiff bears the pleading burden (as opposed to an affirmative defense). *Cf. Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1029 (2025).

In *Cunningham*, the Supreme Court addressed the pleading burden with respect to certain claims under ERISA's prohibited transaction provisions. The Court held that a plaintiff asserting claims under ERISA § 406(a)(1)(C) need only plausibly allege the elements of that provision, and is not required to address potential exemptions set forth in ERISA § 408(b)(2), which are affirmative defenses. In reaching this conclusion, the Court observed that the section heading— "Enumeration of transactions exempted from section [4]06 prohibitions"—indicated that Congress intended section 408(b) to carve out *exceptions* to otherwise prohibited conduct. *Id.* at 1028-29. The title of section 408(c)—"Fiduciary benefits and compensation *not prohibited by section [4]06*"—evidences that the types of payments described in that provision, including reasonable compensation for services rendered, do not constitute a prohibited transaction in the first place. 29 U.S.C. § 1108(c) (emphasis added). Plaintiff therefore bears the burden of pleading facts showing that the challenged fees fall outside the scope of section 408(c)(2). He has not done so, and Count IV fails as a matter of law.

> **4.** **Plaintiff Fails to Plead a Necessary Element of His Claims Under ERISA §§ 406(a)(1)(D) and 406(b)(1).**

Plaintiff's claims under ERISA §§ 406(a)(1)(D) and 406(b)(1) require transactions involving "plan assets." Compl. ¶166(a)-(b); 29 U.S.C. §§ 1106(a)(1)(D) (prohibiting "the

transfer to, or use by or the benefit of a party in interest, of any assets of the plan"); 1106(b)(1)

(prohibiting dealing with "assets of the plan" in one's own interest).  Count IV provides no

explanation of what "plan assets" Plaintiff believes fiduciaries dealt with and fails for that reason

alone.

IV.    **Count V Should Be Dismissed Because It Is Derivative of Counts I Through III.**

Plaintiff's derivative claim for breach of the duty to monitor (Count V) fails because

Plaintiff fails to state a claim for an underlying violation.  *Rinehart v. Lehman Bros. Holdings*

*Inc.*, 817 F.3d 56, 68 (2d Cir. 2016) (affirming dismissal of monitoring claim where plaintiffs

failed to plead an underlying breach); *Boyette*, 2024 WL 1484115, at *6 (same).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Complaint with prejudice.

Dated: August 13, 2025                           Respectfully submitted,

                                                 /s/ *Alison V. Douglass*
                                                 Alison V. Douglass (admitted *pro hac vice*)
                                                 GOODWIN PROCTER LLP
                                                 100 Northern Avenue
                                                 Boston, MA 02210
                                                 Telephone: (617) 570-1000
                                                 adouglass@goodwinlaw.com

                                                 Benjamin S. Reilly (admitted *pro hac vice*)
                                                 GOODWIN PROCTER LLP
                                                 1900 N Street, NW
                                                 Washington, DC 20036
                                                 Telephone: (771) 200-2050
                                                 breilly@goodwinlaw.com

                                                 Nehama L. Hanoch (admitted *pro hac vice*)
                                                 GOODWIN PROCTER LLP
                                                 620 Eighth Avenue
                                                 New York, NY 10018

Telephone: (212) 813-8800
nhanoch@goodwinlaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Alison V. Douglass, hereby certify that the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint contains 8,750 words, as reported by Microsoft Word, not including those portions of the document that do not count against the word limit.

*/s/ Alison V. Douglass*
Alison V. Douglass
