**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN BYRNE, CHARLES SULLIVAN, AND SARAH JOHNSON, individually and as representatives of classes of similarly situated participants in the TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA (TIAA) CODE SECTION 401(k) PLAN and the TIAA RETIREMENT PLAN,<br><br>    PLAINTIFFS,<br><br>    v.<br><br>TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA (TIAA), the TIAA BOARD OF TRUSTEES and its members, the TIAA PLAN INVESTMENT REVIEW COMMITTEE and its members, and JOHN DOES 1–30,<br><br>    DEFENDANTS. | **CASE NO. 25-CV-4228-VSB (RFT)** |

**AGREEMENT AND [PROPOSED] ORDER**
**REGARDING ELECTRONIC DISCOVERY PROTOCOLS**

Plaintiffs Brian Byrne, Charles Sullivan, and Sarah Johnson ("Plaintiffs") and Defendants

Teachers Insurance and Annuity Association of America ("TIAA"), the TIAA Board of Trustees

and its members (the "Board of Trustees"), and the TIAA Plan Investment Review Committee and

its members (the "Investment Committee") (collectively, "TIAA Defendants" or "Defendants"),

stipulate to and request that the Court enter the following Order for the production of electronically

stored information ("Electronically Stored Information" or "ESI") in the above-captioned matter

(the "Order").

1

## I.    <u>GENERAL</u>

1.    This Order shall govern the discovery of ESI in this case. It is intended as a supplement to the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the Southern District of New York, and any other applicable orders and rules. To the extent this Order is silent on an issue or conflicts with the Federal Rules of Civil Procedure, the scope of discovery under Federal Rule of Civil Procedure 26(b) shall govern.

2.    This Order applies also to any third-party discovery, pursuant to Federal Rule of Civil Procedure 45, if agreed to by the subpoena recipient. Nothing contained herein modifies Federal Rule of Civil Procedure 45.

3.    Nothing in this Order shall be deemed to constitute a waiver of any objections a producing party may have with respect to any discovery request.

4.    Subject to the parties' objections and responses to requests for production ("Requests for Production") of  documents ("Documents"), all non-privileged Documents discoverable under the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the Southern District of New York, and any other applicable orders and rules, shall be produced in the manner provided herein.

## II.    <u>DEFINITIONS</u>

1.    "**Document**" is synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Civil Procedure 26 and 34. It includes, but is not limited to, any documents or ESI existing in any medium—including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation

or conversion by the producing party into a reasonably usable form.  The  term  "Document" includes Hard-Copy Documents and ESI as defined herein.

2.      "**Electronically Stored Information**"  or "**ESI**" is synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Civil Procedure 26 and 34.  It includes, but is not limited to, any Document or other data existing in electronic form at the time of collection, including but not limited to, emails or other means of electronic communications, word processing files (e.g., Microsoft Word), computer presentations (e.g., PowerPoint slides), spreadsheets (e.g., Excel), image files (e.g., PDF and .JPG), or information stored in databases, softwares, applications, and platforms.

3.      "**Hard-Copy Document**" means a Document existing in paper form at the time of collection, or otherwise stored in a manner other than electronically.

4.      "**Native Format**" or "**Native File**" means and refers to the format of ESI in which a Document was created, maintained, generated, stored,  or used by the producing party in the usual course of the party's business or regularly conducted activities (e.g., the native format of an Excel workbook is the .xls or .xlsx file).

5.      "**Metadata**" means: (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, stored, or modified such native file which describes the characteristics, origins, usage, or validity of  the electronic file; or (ii) information generated automatically by the operation of a computer  or other information technology system when a native file is created, modified, transmitted,  deleted, or otherwise manipulated by a user of such system.

6.    "**Medium" or "Media**" means an object or device, real or virtual, including but not limited to a  disc, tape, computer, smart phone, camera, or other device on which data is or was stored.

7.    "**Optical Character Recognition**" or "**OCR**" means the optical character recognition file that is created by software used in conjunction with a scanner that is capable of reading text-based Documents and making such Documents searchable using appropriate software.

8.    "**Hash Value**" is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard software function applied to the characteristics of the data set.  The most commonly used functions are known as MD5 and SHA-1.

9.    "**Discovery Material**" means Documents and any other information or material derived, produced, disclosed, given, or exchanged, including all deposition transcripts and material, by or among any party or non-party in connection with discovery in the above captioned matter.

10.    "**Confidentiality Designation**" means the legend affixed to Documents that constitute Confidential Information as defined by, and subject to, the terms of the protective order entered in this case (Dkt. No. 43).

11.    "**Searchable Text**" means the native text extracted from ESI and any Optical Character Recognition text ("**OCR text**") generated from a hard-copy document or electronic image.

12.     "**Load File**" means an electronic file provided with a production set of Document images that facilitate the loading of such information into a receiving party's Document review platform, and the correlation of such data in the platform.

13.     "**Unitization**" means a set of paper-scanned images or electronically processed files and indicates where individual pages or files belong together as Documents, including attachments, and where each Document begins and ends.

14.     "**Technology Assisted Review" or "TAR"** means a process for prioritizing or coding a collection of electronically stored information using a computerized system that harnesses human judgments of subject-matter experts on a smaller set of documents and then extrapolates those judgments to the remaining documents in the collection. Some TAR methods use algorithms that determine how similar (or dissimilar) each of the remaining documents is to those coded as relevant (or nonrelevant) by the subject-matter experts, while other TAR methods derive systematic rules that emulate the experts' decision-making processes. TAR systems generally incorporate statistical models and/or sampling techniques to guide the process and to measure overall system effectiveness.

## III.     DATA SOURCES AND CULLING CRITERIA

1.     **Custodians and Custodial Data Sources.**  Within fourteen days of the earlier event of either (i) entry of an Order by this Court granting the parties discovery or (ii) any denial of Defendants' Motion to Dismiss the Amended Complaint and on an ongoing basis, but no later than sixty days prior to the discovery cut off, the parties shall meet and confer to identify custodians, including names, titles, and date ranges, and custodial data sources whose ESI will be reviewed pursuant to this Order.

2.    **Non-Custodial Data Sources.**  The parties shall meet and confer to identify any non-custodial data sources whose ESI will be reviewed pursuant to this Order.

3.    **Methodology.**  The parties agree to use reasonable, industry approved and standard methods to search for, identify, and review responsive ESI. If a dispute arises as to a party's ESI searches, methodology, or production, the parties shall meet and confer in good faith.

## IV.    SEARCH TERM DISCLOSURE

### A.    Initial Search Terms and Validation Procedures

1.    Within 20 days of the entry of an Order by this Court granting the parties discovery, and prior to the use of search terms to cull specific data sets to collect ESI in advance of a review for responsiveness, the producing party shall provide the receiving party with a list of the search terms and queries it proposes to use in the exact forms that they will be applied (*i.e.*, as adapted to the operators and syntax of the search platform), used to locate data likely to contain responsive and discoverable information as well as any other culling measures that are not otherwise covered by this Order (*e.g.*, date range).

2.    Within five days of receiving the producing party's proposed search terms, the parties will meet and confer about the search terms, including with respect to relevant company terminology (or equivalent) and relevant acronyms, abbreviations, common misspellings of the listed search terms, and nicknames, if any.

3.    Within 10 days of the parties' meet-and-confer referenced in the prior paragraph, the receiving party shall provide the producing party with comments, proposed revisions, and responses to the producing party's proposed search terms.

4. Within 10 days of receiving the receiving party's comments, proposed revisions, and responses to the producing party's proposed search terms, the parties will meet and confer over the search terms and validation procedures that either party believes should be implemented. The producing party reserves the right to review all Documents hitting on any search terms for responsiveness and privilege, consistent with any objections and responses to discovery requests served upon that party.

5. The parties are expected to work in a collaborative manner, including potential supplementation, if necessary, to enhance or improve the identification of potentially relevant ESI. The parties envision an iterative process whereby counsel for the producing party and appropriate ESI liaisons will together review the report of the results of initial searches, and, in good faith, tailor the use of search strings so as to effectively identify potentially relevant and responsive ESI. Documents and ESI that is reasonably known to the producing party to be non-privileged and responsive to a discovery request shall be produced and not withheld on the basis that it was not captured by a search term or as part of an overall search process. This provision does not constitute a waiver of any objections a producing party may have with respect to any discovery request.

**B. Hit Reports**

6. A search term hit report will be provided by the producing party to the receiving party for each search term. If the Documents have not been collected, the search term hit report shall be generated using the native application. If the Documents have been collected and processed, the search term hit report shall be generated across the de-duplicated document collection and include (i) the "hit count" of the raw number of Documents identified per search term; (ii) the total number of unique Documents with hits across all search terms; (iii) the total

number of Documents, including their family members, identified per search term; and (iv) the review universe if all terms were to be accepted.

### C. TAR

7.　　　The use of search terms will not preclude the parties' use of other reasonable review tools, including TAR.  The parties agree that a producing party is best situated to evaluate the procedures, methodologies, and technologies appropriate for producing their own hard-copy and ESI.  If a producing party intends to use TAR or similar advanced analytics technology to cull Documents for review and production, the producing party shall disclose as part of the process: (i) the custodial data sources and non-custodial data sources against which TAR will be run; (ii) the TAR software that will be used, as well as whether a TAR 1.0 or TAR 2.0 (CAL) workflow or other workflow will be implemented; (iii) the  Document samples that are generated and used to train the TAR model; (iv) any Documents, Document types, file types, or other categories that the producing party proposes to exclude from the TAR process, the method of identifying such Documents to be excluded, and the sample used to validate the Documents excluded from review. When the producing party determines that further review of Documents in the TAR population is disproportionate, the producing party will disclose (i) the validation process used to support ceasing review; and (ii) the estimated recall rates based upon an elusion-based estimation approach. Any Party utilizing TAR for the review of Documents must remain closely involved in the review and sampling process for the TAR review.  For the avoidance of doubt, a producing party is not required to produce, disclose or provide to the requesting party and Document that it deems as privileged or non-responsive.

8.      If the parties are unable to agree on the TAR or advanced analytics technology and methods being proposed after meeting and conferring, the parties shall notify the Court of their unresolved dispute and seek resolution by the Court or an appointed discovery master.

9.      Nothing in this Order prevents a party from reviewing and analyzing information identified by search terms and/or TAR to determine whether that information is responsive to a request for production and withholding documents determined to be non-responsive.  Further, the mere fact that a Document is hit on or is captured by the application of any agreed upon search terms does not mean that such Document is necessarily responsive to any propounded discovery request or is otherwise relevant to this litigation.

## V.      **FORMAT OF PRODUCTION**

1.      **Proprietary Software.**  To the extent that Native Files are produced that require proprietary software for access and review, the producing party shall make reasonable efforts to supply the receiving party with a copy of such software to allow the receiving party to review the files, or make such files available for review in an alternative format.

2.      **Password Protected Files.**  The parties agree to utilize reasonable  efforts to open password-protected or encrypted files, including commercially accessible  software, when appropriate and feasible.

3.      **System Files.**  The parties may exclude system-generated files and  folders that are not likely to contain user-created files from their review (e.g., by DeNISTing).  If the parties choose to do so, they will notify each other of that decision (including a description of excluded Documents) prior to production in writing.

4.      **De-Duplication Across Custodians.**  A party is required to produce only a

single copy of a responsive Document, and a party shall make reasonable efforts to de-duplicate responsive ESI (based on MD5 or SHA-1 Hash Values at the Document level) across custodians. The fields upon which the Hash Value of emails are calculated shall be disclosed by the producing party. The producing party will provide a Duplicate Custodian field in the production Load File sufficient for the receiving party to identify each custodian of a particular Document that was eliminated through de-duplication as well as the file path in which the Document was kept in the ordinary course in the duplicate custodian's files. If all recipient custodians are documented for removed Documents in the Duplicate Custodian field, the producing party need produce only a single copy of the particular Document; however, the receiving party may request a reasonable number of duplicate copies identifying particular custodians. For emails with attachments, the Hash Value shall be generated based on the parent-child Document grouping, and only email messages in which the parent document and all attachments are exactly the same will be considered duplicates. For Documents, prior drafts of Documents will not be considered duplicates, although the parties acknowledge that a draft of a Document may be responsive while a final copy is not, and vice-versa. The Custodian, FilePath, and EmailFolder will be included (for all available copies of responsive ESI) in the respective CUSTODIAN(S), FILEPATH(S), and EMAIL_FOLDER(S) fields in the production Load File. In addition, if the email files were collected directly from the Microsoft Exchange server, outlook.ost files may be excluded from processing as duplicative of outlook.pst files unless only the .ost file version is available.

5.      **Email Threading.** The parties may use advanced analytics technology to identify email threads and need only produce the unique most inclusive copy and related family

members and may exclude lesser inclusive copies.  Upon reasonable request, the producing party will produce a less inclusive copy to the receiving party.

6. **Non-Redacted ESI Not Produced in Native Form.**  Non-redacted ESI should be produced in a form no less "searchable" than it is maintained in the normal course of the producing party's business. ESI will be produced in single-page, black and white, 300 DPI, Group IV TIFF image file format together with Load File (depending on the reasonable preference of the requesting party), with searchable extracted text of the Document (at the Document level in a .TXT file) and the Metadata fields listed in Exhibit A, if available and applicable (except that the parties agree that Metadata fields may be redacted on any basis permissible under the Federal Rules of Civil Procedure so long as redactions are identified as such). If Documents, such as email, are produced, the relationship between related Documents (e.g., email attachments) should be preserved. All non-privileged ESI attached to an email should be produced contemporaneously and sequentially immediately after the parent email. Any attachments withheld for privilege must be identified.

7. **ESI to be Produced in Native Form.**  Non-redacted Excel files, .CSV files other similar spreadsheet files, presentation files (e.g., PowerPoint), audio or video media files, or other file formats where an image file does not adequately represent the files as maintained in the ordinary course, shall be produced in their Native Format, including the formulae embedded in the spreadsheet and any Metadata contained in the file. A party may request a reasonable number of Word version of Documents to be produced in native form if the substance of any comments or tracked changes or the identity of the individual(s) who made such comments/track changes cannot be discerned from the TIFF file. The producing party reserves the right to object

if the requests become unreasonably onerous.  Files produced in  Native  Format shall be named either with a  sequential Bates number followed by  the  file  extension or with a sequential Bates number  followed  by  the  Confidentiality  Designation,  if  applicable,  and  the  file  extension.  A placeholder TIFF with language "Document Produced in  Native" or similar language shall be included  for  each  native  file  produced.   To  the  extent  native  files,  including  electronic spreadsheets, are redacted, production shall be made in TIFF format in   accordance with the "Redacted Documents" section.  To the extent other file formats present specific challenges, the parties agree to cooperate in good faith to address the format in which those Documents should be produced.

8.     **Hard-Copy Documents.**  Hard-Copy Documents should be produced as single-page, black and white Group IV TIFF images (300 DPI resolution) with coded data contained in a separate file.  The producing party shall also provide Document-level OCR text files to accompany the TIFF format production.  The minimum fields for a scanned Hard-Copy Document record will be BEGBATES, ENDBATES, BEGATTACH, ENDATTACH, CUSTODIAN(S) indicating the beginning and ending Bates numbers, attachments ranges of all Documents, and the custodian information (also listed in Exhibit A).  Hard-Copy Documents shall be OCR'ed and the OCR text shall be provided as one .TXT file per Document.

9.     **Document Unitization for Hard-Copy Documents.**  If a Hard-Copy Document consists of more than one page, the producing party shall use reasonable efforts to unitize the Document and any attachments in a logical manner that is consistent across the entire Document production and does not unnaturally split Documents (e.g., a 10-page hard-copy presentation would be produced as a single 10-page Document, rather than 10 1-page Documents or two 5-page

Documents). For example, if a producing party intends to produce multiple tabbed binders containing Hard-Copy Documents, the Producing Party shall implement a consistent unitization protocol for the Hard-Copy Documents within those tabbed binders. Pages containing affixed notes, such as post-it notes, will be scanned with and without the note, with the image with the note preceding the image without the note.

10. **Redacted Documents.** The parties may redact the following from Documents or ESI: material covered by the attorney-client privilege, attorney work-product protection, or other applicable privilege or immunity from disclosure. Such redactions shall be indicated consistent with the protective order entered in this case (Dkt. No. 43). The parties will include tags in the text of the Document and in the Metadata indicating "Privileged Material Redacted." For redacted ESI, the parties agree to produce as redacted single-page, black and white Group IV TIFF images with Metadata contained in a separate file. If ESI is produced in redacted form, the same Metadata fields listed in Exhibit A shall be produced for redacted ESI except that fields may be redacted to the extent that they contain redactable data.

11. **Parent-Child Relationships.** The association between a Document and any attachments thereto shall be preserved. Attachments to a Document will be consecutively produced immediately after the parent Document. The producing party shall insert a slip sheet for any parent Document or attachment in a producible family over which the producing party claims privilege while maintaining the original consecutive order of the attachment(s).

12. **Databases, Structured or Application ESI.** The parties shall meet and confer prior to the production of reasonable accessible structured data ESI to ensure such ESI is produced in a reasonable, proportional, mutually agreeable, and reasonably useful format.

13.    **Non-Standard Files.**  To the extent that any responsive ESI exists as a non-standard electronic file, such as source code, transaction data, or proprietary applications not publicly available, the producing party shall promptly notify the receiving party, and the parties will meet and confer regarding the format of production.

14.    **Social Media.**  Relevant ESI from social media websites (e.g., LinkedIn, Facebook,  Twitter, Instagram) may be produced by capturing responsive information through "screenshots" or "screen captures" and converting the same into images along with corresponding  OCR or extracted  text.  The parties will meet and confer to ensure relevant metadata is produced (e.g., date and timestamps of posts).

15.    **Bates Numbering.**  Each page of a produced image shall have a unique Bates number electronically "stamped" or "burned" on the image at a location that does not unreasonably obliterate  or obscure any information from the source Document.  Each TIFF image or native file assigned  a Bates number shall be assigned a Bates number that is unique and maintains a constant length  across the entire Document production.  No other legend or stamp will be placed on the Document  image other than confidentiality legends (where applicable) or redactions.  The parties acknowledge that production of multiple Documents at once may at times result in a Bates number that obliterates or obscures information, and the parties agree to work together in good faith to address specific issues as they arise.  Bates numbers should appear in a way that can be recognized by OCR software.

16.    **Confidentiality.**  ESI produced in discovery may be labeled with Confidentiality Designations pursuant to the protective order entered in this case (Dkt. No. 43).  In the case of TIFF images, confidentiality legends shall be "stamped" or "burned" on the image at a location

that does not unreasonably obliterate  or obscure any information from the source Document.  For materials produced in Native Format, the producing party shall name the file with the Bates number followed by the Confidentiality Designation and the file extension.

17.    **No Color.**  Documents in color need not be produced in color as a matter of course except where production in color is apparently necessary to fully comprehend the Document (e.g., where categories are distinguished by different colors of text).  A party may request that a reasonable number of specifically identified Documents (e.g., social media posts) be produced in a color .PDF or .JPG format.

18.    **Production Media.**  Documents shall be produced on CDs, DVDs, USB hard drives, portable hard drives, or through secure file transfer protocols (e.g., FTP) or similar secure electronic transmission.  The volume number and Bates number range(s) of the materials shall be included on the production media label or,  where it is  not  practicable  to  do  so,  in an accompanying letter.  If a producing party encrypts or "locks" a production, the producing party shall send, under separate correspondence, the password for decrypting the production.

19.    **Time Zone.**  All ESI must be processed using Coordinated Universal Time (UTC).

20.    **Rolling Production.**  Documents shall be produced by the parties on a rolling basis but no later than thirty days before the discovery cut-off in response to a timely request for production of documents.

## VI.    USE OF DISCOVERY MATERIAL IN AI TOOLS

1.    Discovery Material can only be used in an artificial intelligence tool ("AI Tool"), including AI Tools built into ESI review platforms, that a receiving party first confirms in writing to the producing party:

(i) restricts receipt and access of the Discovery Material to the receiving party; and

(ii) either

(a) does not retain the Discovery Material such that it is available to any developers, providers or operators of the AI Tool in any form or manner, whether as stored data or changes to code or algorithmic learning or otherwise, or

(b) in the event of any such data retention, the AI Tool is used by or on behalf of the receiving party solely in connection with this action and is decommissioned and all Discovery Material securely and permanently erased, following conclusion of the action; and either

(iii) the AI Tool is "stateless," meaning that neither the tool nor any system containing the tool will be modified, improved, or changed following use of the AI Tool with Discovery Material such that the AI Tool will neither retain or store Discovery Material in raw form or through any tokenization, embedding, or through any other method, or

(iv) if the AI Tool is not stateless, the AI Tool shall be:

(a) only available to a receiving party and only for the purposes of this action, and

(b) upon the conclusion of permitted processing under this Order, either permanently reset to a default state that existed prior to the receipt of Discovery Material or securely deleted in its entirety.

2.. The receiving party must also make reasonably sure it can delete all Discovery

Material, and any information derived therefrom, from the AI Tool upon termination of this action, and shall also certify the destruction of all Discovery Material submitted into any AI Tool, consistent with the parties' obligations under Paragraph 14 of the protective order entered in this case (Dkt. No. 43). Discovery Material shall not, under any circumstances, be used in or with any AI Tool (e.g., ChatGPT) or any other substantially similar tool, model, software, or application that does not comply with the above requirements; and any such use that does not comply is unauthorized and strictly prohibited.

## VII.    **PRIVILEGE AND WORK PRODUCT CLAIMS**

1.      The parties recognize that Documents may be redacted or  withheld on the grounds of attorney-client privilege, work-product doctrine, or other applicable  privilege from disclosure (collectively, "privilege"). The producing party shall provide a privilege log for Documents withheld on the basis of privilege setting forth the author, recipient(s), subject matter of the Document, along with the basis for such claim of privilege within 45 days after the production of documents for which a privilege is asserted, absent stipulation or Court order. The privilege log shall be produced in native format. Either party may file a motion with the court for a determination of the claim of privilege.

2.      The parties agree that if the following Documents are privileged, they need not be included on a privilege log: internal communications within Sanford Heisler Sharp McKnight, LLP, AARP Foundation (including communications between Sanford Heisler Sharp McKnight LLP and AARP Foundation after the date on which both Sanford Heisler Sharp McKnight LLP and AARP Foundation had established attorney-client relationships with plaintiffs in this action),

and Goodwin Procter, LLP (the "Law Firms"); communications between the Law Firms and their clients; materials created by the Law Firms as part of the investigation or litigation of this case.

## VIII.  **MISCELLANEOUS**

1.      **No Waiver.**   Nothing in this Order shall be interpreted or deemed to waive any privilege recognized by law, including attorney-client privilege, the attorney work-product doctrine, or any other privilege that may be applicable, or shall be construed to imply that any Documents produced under the terms of this Order are properly discoverable, relevant, or admissible in this action or in any other litigation, mediation, or arbitration.  This Order does not create any additional obligation to produce documents, but rather, simply sets forth the protocol that the parties will utilize to perform the search for electronic Documents that are potentially responsive to the document requests, preserving all objections to such requests.  Consistent with the protective order entered in this case (Dkt. No. 43),  the production of any Documents in this proceeding, whether inadvertent or otherwise, shall not, for the purposes of this proceeding or any other federal or state proceeding, constitute a waiver by the producing party of any privilege applicable to those Documents, including the attorney-client privilege, attorney work-product protection, or any other privilege or protection recognized by law. Information produced in discovery that is recognized to be protected as privileged or work product shall be returned to the producing party within seven days of the party's actual discovery of the inadvertent disclosure, and its production shall not constitute a waiver of such protection. The producing party must log the Document(s) on the privilege log within 45 days of their return.

2.      **Objections Preserved.**  Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client

privilege, work-product doctrine, or any other applicable privilege or immunity.  The parties do not waive any objections as to the production, discoverability, admissibility, or confidentiality of Documents.

3.      **Failure to Preserve ESI**.  If the producing party discovers that ESI that should have been preserved in the anticipation or conduct of litigation is lost and cannot be restored or replaced, the producing party must disclose the loss to the receiving party within fourteen days of actual discovery of the loss. The disclosure must include sufficient details for the receiving party to reasonably understand the circumstances of the loss.

4.      **Dispute Resolution.**  The parties will meet and confer to address any disputes relating to the identification, collection, review, or production of Documents.  If the parties cannot reach an agreement, either party may present the dispute to the Court for resolution.

5.      **Modification.**  This Order may be modified by a stipulation of the parties with approval of the Court or by the Court for good cause shown.

SO STIPULATED AND AGREED this 23rd day of June, 2026.

<table>
<tr>
<td>

_/s/Meghan Heesch_
Charles Field* (CA Bar No. 189817)
Meghan Heesch* (CA Bar No. 355708)
SANFORD HEISLER SHARP MCKNIGHT, LLP
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 369-4523
cfield@sanfordheisler.com
mheesch@sanfordheisler.com

Sharon Kim (SK2752)
SANFORD HEISLER SHARP MCKNIGHT, LLP
17 State Street, Suite 3700
New York, NY 10004

</td>
<td>

_/s/Benjamin S. Reilly (w/ permission)_
Benjamin S. Reilly*
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone: (771) 200-2050
breilly@goodwinlaw.com

Alison V. Douglass*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
adouglass@goodwinlaw.com

</td>
</tr>
</table>

Dated: June 23, 2026
New York, NY

SO ORDERED

19

ROBYN F. TARNOFSKY
UNITED STATES MAGISTRATE JUDGE

Telephone: (646) 402-5650
sharonkim@sanfordheisler.com

LOUIS LOPEZ*
RACHEL N. LOKKEN*
STEFAN SHAIBANI*
DAVID S. YELLIN (DY8824)
AARP FOUNDATION
601 E Street NW
Washington, DC 20049
Telephone: (202) 434-6666
llopez@aarp.org
rlokken@aarp.org
sshaibani@aarp.org
dyellin@aarp.org

*Admitted pro hac vice**
*Attorneys for Plaintiffs*

Samuel J. Rubin
Nehama L. Hanoch*
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
srubin@goodwinlaw.com
nhanoch@goodwinlaw.com

*Admitted pro hac vice**
*Counsel for Defendants*

Dated: June ___, 2026                          **SO ORDERED:**


_____

Hon. Robyn F. Tarnofsky
United States Magistrate Judge

## EXHIBIT A

| Field | Definition | Doc |
|---|---|---|
| SOURCE | Name of party producing the Document | All |
| CUSTODIAN(S) | Names of person or other data source (non-human) from where Documents/files are produced.<br><br>Where redundant names occur, individuals should be distinguished by an initial which is kept constant throughout productions (e.g., Smith, John A. and Smith, John B.). This field should include the names of persons from whom the Document was collected in the case of duplicates. | All |
| BEGBATES | Beginning Bates Number (production number) | All |
| ENDBATES | End Bates Number (production number) | All |
| PGCOUNT | Number of pages in the Document | All |
| FILESIZE | File Size | All |
| FILEPATH(S) | Original file/path of the locations where the item resided at the time of preservation. This should include location, file name, and file source extension. | All |
| NATIVEFILELINK | File path for Documents provided in Native Format | All |
| TEXTPATH | File path for OCR or Extracted Text files | All |
| FILE NAME | Original file name of the item including extension | All |
| FILETYPE | Application that created the file (e.g., Word, Outlook, Excel, Adobe) | All |
| FILE EXTENSION | Extension of the file (e.g., .docx, .pdf, .xlsx, .msg) | All |
| EMAIL FOLDER(S) | Folder location of the email within the .PST/.OST | Email |
| FROM | Sender | Email |
| TO | Recipient | Email |
| CC | Additional Recipients | Email |

21

| BCC | Blind Additional Recipients | Email |
|---|---|---|
| SUBJECT | Subject line of email | Email |
| PARENTBATES | BEGBATES number for the parent email of a family (will not be populated for Documents that are not part of a family) | Email |
| ATTACHBATES | Bates number from the first page of each attachment | Email |
| BEGATTACH | First Bates number of family range (i.e., Bates number of the first page of the parent email) | Email |
| ENDATTACH | Last Bates number of family range (i.e., Bates number of the last page of the last attachment) | Email |
| DATESENT (mm/dd/yyyy hh:mm:ss AM/PM) | Date Sent (including time) | Email |
| DATERCVD (mm/dd/yyyy hh:mm:ss AM/PM) | Date Received (including time) | Email |
| EMAILDATSORT (mm/dd/yyyy hh:mm:ss AM/PM) | Sent Date (including time) of the parent email (i.e., physically top email in a chain) | Email |
| HASHVALUE | MD5 Hash Value (or an alternatively agreed upon Hash Value) for email, attachments, and other ESI, computed at the time of processing | All |
| TITLE | Title from internal Document Metadata property | Electronic Data |
| AUTHOR | Creator of ESI | Electronic Data |
| DATECRTD (mm/dd/yyyy hh:mm:ss AM/PM) | Creation Date (including time) | Electronic Data |
| LASTMODD (mm/dd/yyyy hh:mm:ss AM/PM) | Last Modified Date (including time) | Electronic Data |
| LASTMODBY | Last Modified By | All |
| Redacted | For Documents that contain redactions, tags indicating that a document has been redacted (Y/N) | All |

| ProdVol | Name of production volume (e.g. VOL001, VOL002, etc.) | All |
| Confidentiality | Confidentiality designation assigned pursuant to any applicable protective order or stipulation | All |